2014 CO 33

**ST. VRAIN VALLEY SCHOOL DISTRICT RE–1J and Cathy O'Donnell, Petitioners,**

**v.**

**A.R.L. a minor, BY AND THROUGH her parents and next friends, Randy LOVELAND and Mary Nicole Loveland; Randy Loveland, individually; and Mary Nicole Loveland, individually, Respondents.**

**Supreme Court Case No. 12SC631**

Supreme Court of Colorado.

May 19, 2014

Attorneys for Petitioners: Senter Goldfarb & Rice, L.L.C., Gillian M. Fahlsing, Thomas S. Rice, Denver, Colorado

Attorneys for Respondents: Purvis Gray, LLP, Michael J. Thomson, Boulder, Colorado

CHIEF JUSTICE RICE delivered the Opinion of the Court.

¶1 We granted certiorari[1] to consider an issue of first impression: whether an injury that occurs on a "zip line" apparatus located on a public school playground fulfills the requirements of the "recreation area waiver," section 24–10–106(1)(e), C.R.S. (2013), of the Colorado Governmental Immunity Act ("CGIA"). The recreation area waiver deprives public entities of immunity from tort liability if an injury results from a "dangerous condition of any . . . public facility located in any park or recreation area." § 24–10–106(1)(e). We hold that a collection of playground equipment considered as a whole qualifies as a "public facility" under the recreation area waiver because such playground equipment is (1) relatively permanent or otherwise affixed to the land, (2) a man-made structure, (3) accessible to the public,

and (4) maintained by a public entity to serve a beneficial, common public purpose. The court of appeals thus erred when it held that the zip line individually, rather than the playground collectively, constituted a "public facility."

¶2 We also hold that the public facility here, i.e., the collection of playground equipment, was "located in" the "recreation area" of the school playground. Applying the three-step analysis from *Daniel v. City of Colorado Springs*, 2014 CO 34, ¶23, 327 P.3d 891, we determine that the public land underlying the playground equipment is the "putative recreation area," that the "primary purpose" of that area is recreation, and that the facility where A.R.L. was injured is "located in" this area.

¶3 On remand, the trial court should conduct further fact finding to determine whether the Respondents can also fulfill the remaining requirements of the recreation area waiver.

## I. Facts and Procedural History

¶4 In November of 2008, A.R.L., a minor child, was playing on a zip line[2] apparatus during her lunch recess. This zip line was part of her public elementary school's playground, which contained other types of playground equipment.[3] While riding the zip line, A.R.L. fell[4] and fractured her wrist. As a result of her injury, the Respondents, Randy Loveland and Mary Nicole Loveland, A.R.L.'s parents, and A.R.L. (collectively "the Lovelands"), sued the Petitioners, Cathy O'Donnell, the elementary school's principal,

---

1. Specifically, we granted certiorari on the following issue, which we reframed for clarity:
   Whether the court of appeals erred in concluding that a zip line apparatus on a public school playground is a public facility located in any park or recreation area maintained by a public entity under section 24–10–106(1)(e), C.R.S. (2013), of the Colorado Governmental Immunity Act.

2. A photograph submitted to the trial court shows that the zip line apparatus was secured in the ground with two thick, vertical poles; these poles were connected by a horizontal piece of inclined pipe with a handle attached to an interior track. To ride the zip line, a child would climb up a short ladder, stand on an elevated platform, grab the handle, release his or her feet

from the platform, and propel forward down the track. At the end of the ride, the child would release the handle and jump down to the ground.

3. The zip line was connected to a gazebo-like play structure but was not attached to a school building.

4. Because the trial court ruled as a matter of law that the recreation area waiver did not apply, it did not make factual findings regarding the precise causal mechanism of A.R.L.'s fall (e.g., whether she lost her grip, whether there was an obstruction or defect on the zip line's track, or whether—as the District argued—another child pushed her off of the zip line).

and St. Vrain Valley School District RE–1J (collectively "the District") in a tort action.

¶ 5 Thereafter, the District filed a Motion to Dismiss pursuant to C.R.C.P. 12(b)(1) ("Motion"), arguing that the trial court lacked subject matter jurisdiction because public school districts—and their employees—are immune from liability under the CGIA. See § 24–10–108, C.R.S. (2013) ("Except as provided in sections 24–10–104 to 24–10–106, sovereign immunity shall be a bar to any action against a public entity for injury which lies in tort or could lie in tort . . . ."); § 24–10–103(5), C.R.S. (2013) (defining a public "school district," such as the District here, as a "public entity" for the purposes of governmental immunity); § 24–10–103(4)(a) (defining a "public employee," such as Principal O'Donnell here, for the purposes of governmental immunity). The Lovelands argued, however, that the District was liable for A.R.L.'s injuries because it had waived immunity pursuant to the recreation area waiver. That waiver provides, in relevant part, that a public entity can be held liable for injuries caused by a "dangerous condition of any . . . public facility located in any park or recreation area maintained by a public entity." § 24–10–106(1)(e). Specifically, the Lovelands contended that the zip line qualified as both a "dangerous condition" and a "public facility" and that the zip line was "located in" a "recreation area" because it was located within the school playground.

¶ 6 The trial court granted the District's Motion, finding that the recreation area waiver was wholly inapplicable to the Lovelands' case, because "playground equipment is not a public facility." [5] The Lovelands then filed an interlocutory appeal pursuant to section 24–10–108.

¶ 7 The court of appeals reversed the trial court's Order granting the District's Motion, holding that the zip line did constitute a "public facility" located in a recreation area pursuant to section 24–10–106(1)(e). *Love-*

*land v. St. Vrain Valley Sch. Dist. RE–1J,* 2012 COA 112, ¶¶ 19, 22, 328 P.3d 228. In particular, the court of appeals concluded that "public facility" was an ambiguous term, as it was subject to two reasonable, but contradictory, interpretations. *Id.* at ¶ 15. Specifically, it held that a "public facility" could encompass *either* (1) larger structures, such as a bricks-and-mortar building, or (2) things other than buildings, such as smaller machinery or equipment. *See id.* Due to this statutory ambiguity, the court of appeals turned to legislative history and concluded that the legislature intended that an individual piece of playground equipment, such as the zip line here, would qualify as a "public facility." *See id.* at ¶ 26. Without further analysis, and apparently relying on the parties' stipulations, the court of appeals also noted that the playground where the zip line was located constituted a "recreation area." *See id.* at ¶ 7. Having found that the "public facility" and "recreation area" requirements of the waiver were met, the court of appeals remanded to the trial court to conduct further proceedings. *See id.* at ¶ 34.

¶ 8 We granted certiorari review. We now affirm the court of appeals' holding, though on different grounds.

## II. Standard of Review

¶ 9 Governmental immunity implicates issues of subject matter jurisdiction that are determined in accordance with C.R.C.P. 12(b)(1). *Swieckowski v. City of Ft. Collins,* 934 P.2d 1380, 1383–84 (Colo.1997). Where, as here, the facts are undisputed and the issue is one of statutory construction, the trial court's ruling is subject to de novo review. *See Medina v. State,* 35 P.3d 443, 452 (Colo.2001) ("[I]f all relevant evidence is presented to the trial court, and the underlying facts are undisputed, the trial court may decide the jurisdictional issue as a matter of law, in which case appellate review is de novo."). [6]

---

5. Having determined that the zip line was not a "public facility," the trial court also found that the waiver's other requirements—i.e., that the public facility is "located in" a "recreation area," that the recreation area is "maintained by" a public entity, and the existence of a "dangerous condition"—were moot issues. Accord-

ingly, it declined to make findings of fact relating to these requirements.

6. Under both C.R.C.P. 12(b)(1) and *Trinity Broadcasting of Denver, Inc. v. City of Westminster,* 848 P.2d 916 (Colo.1993), the trial court

## III. Analysis

¶ 10 Resolution of this case requires us to construe an undefined provision of the CGIA. In conducting statutory interpretation, our primary task is to ascertain and give effect to the legislature's intent— the polestar of statutory construction. *State v. Nieto*, 993 P.2d 493, 500, 502 (Colo.2000). We seek to effectuate legislative intent by construing the statute as a whole, giving consistent, harmonious, and sensible effect to all of the statute's parts. *Elgin v. Bartlett*, 994 P.2d 411, 416 (Colo.1999). When legislative language is unambiguous, we give effect to the statute's plain and ordinary meaning without resorting to other rules of statutory construction. *See Springer v. City & Cnty. of Denver*, 13 P.3d 794, 799 (Colo.2000).

¶ 11 On the other hand, when we determine that the language of a statute is ambiguous, we may also look to other tools of statutory interpretation to decipher legislative intent. *Grant v. People*, 48 P.3d 543, 546 (Colo.2002). Often the best guides to legislative intent are the context in which the statutory provisions appear and any accompanying statements of legislative policy, such as a legislative declaration. *Stamp v. Vail Corp.*, 172 P.3d 437, 443 (Colo.2007); *see also* § 2-4-203(1), C.R.S. (2013) (noting that when statutory ambiguity exists, a reviewing court may consider, among other things, the object sought to be attained by the statute, the consequences of a particular construction, and the legislative declaration). Additionally, the meaning of an ambiguous statutory term may be ascertained by reference to the meaning of words associated with it. *State v. Hartsough*, 790 P.2d 836, 838 (Colo.1990).

¶ 12 Before turning to our analysis of A.R.L.'s case, it is helpful to consider the overarching purposes of the CGIA. The law is designed to shield public entities from tort liability, unless the circumstances of an asserted claim bring it within one (or more) of the statute's expressly defined waiver provisions. *See Young v. Brighton Sch. Dist.*

*27J*, 2014 CO 32, ¶ 13, 325 P.3d 571 (explaining that although the CGIA generally acts as a "shield" protecting public entities from tort liability, it also "automatically waives this immunity shield in a limited number of situations that are explicitly defined by the statute"). Because governmental immunity under the CGIA derogates Colorado's common law, we narrowly construe the CGIA's immunity provisions, and as a logical corollary, we broadly construe the CGIA's waiver provisions. *See Springer*, 13 P.3d at 798 (discussing the history of this Court's abrogation of Colorado's common law of governmental immunity in 1971, the legislature's subsequent enactment of the CGIA in response to this abrogation, and the rule to broadly construe the CGIA's waiver provisions). Despite this general rule of broad construction, however, our touchstone remains the intent of the legislature. *Hartsough*, 790 P.2d at 838.

¶ 13 With both the principles of statutory construction and the purposes of the CGIA in mind, we turn to the specific waiver provision that is pertinent to this case—the recreation area waiver outlined in section 24–10–106(1)(e). The recreation area waiver provides that a public entity is exposed to liability for injuries resulting from a "dangerous condition of any ... public facility located in any park or recreation area maintained by a public entity, or public water, gas, sanitation, electrical, power, or swimming facility." § 24–10–106(1)(e).

¶ 14 Because we granted certiorari to determine if a zip line apparatus qualifies as a "public facility" under the recreation area waiver, we will address that waiver requirement first. We then address whether the playground equipment was "located in" a "recreation area."

### A. The Entire Collection of Playground Equipment Here Qualifies As a "Public Facility"

¶ 15 We now consider the issue at the heart of this case: whether the individual

may allow for limited discovery and conduct an evidentiary hearing to resolve any factual disputes that implicate the court's jurisdiction. *Trinity Broad.*, 848 P.2d at 924–25. An appellate court will not disturb these factual findings unless they are clearly erroneous. *Swieckowski*, 934 P.2d at 1384. Where there is no evidentiary

dispute, however, waiver of immunity is a matter of law, and the trial court may rule on the jurisdictional issue without a *Trinity* hearing. *Padilla v. Sch. Dist. No. 1*, 25 P.3d 1176, 1180 (Colo.2001). Here, the trial court ruled without a hearing.

zip line qualifies as a "public facility" under the recreation area waiver. We conclude that an individual piece of playground equipment does not qualify as a "facility." Rather, the *entire collection* of playground equipment qualifies as a "facility," and depending on the factual circumstances of a given case, a condition of an individual piece of playground equipment might qualify as a "dangerous condition" of that facility. Additionally, we hold that a playground located on the premises of a public elementary school is "public."

¶ 16 As a threshold matter, we hold that "public facility" in section 24–10–106(1)(e) is an ambiguous term, as it is reasonably subject to two differing interpretations: it can be construed to encompass a single piece of playground equipment, like the zip line apparatus here, or to exclude such equipment. *See Nieto*, 993 P.2d at 500–01 (noting that statutory language is ambiguous when "the words chosen by the legislature are ... capable of two or more constructions leading to different results"). Indeed, in the context of determining the meaning of the term "public water facility" under another CGIA waiver, section 24–10–106(1)(f), we held that there is no plain and ordinary meaning of "public facility." *City & Cnty. of Denver v. Gallegos*, 916 P.2d 509, 511 (Colo. 1996), *overruled in part for other reasons by Corsentino v. Cordova*, 4 P.3d 1082, 1086 (Colo.2000) ("Neither the term 'public water

facility' nor 'public facility' is defined by the [C]GIA. Furthermore, there is no 'ordinary meaning' for either phrase.").

¶ 17 What qualifies as a "public facility" for purposes of the recreation area waiver is a question of first impression for this Court. The term "public facility" is not defined in the CGIA and there is no pertinent legislative history [7] that can illuminate its intended meaning. Accordingly, we must determine the meaning of "public facility" without explicit guidance from the legislature. We thus turn to basic principles of statutory construction to guide our analysis.

### 1. A Single Piece of Playground Equipment Is Not a "Facility"

¶ 18 We hold that an individual zip line apparatus on a public playground does not qualify as a "public facility" under the recreation area waiver when that apparatus is divorced from the rest of the playground. Rather, a condition on such an apparatus might qualify as a *dangerous condition*.[8] On the other hand, the entire playground—considered as a whole, including the collection of playground equipment—can qualify as a *"public facility."* Our holding is anchored in the dictionary definition of "facility," the statutory context, and the CGIA's purposes.

¶ 19 Having determined that there is no plain and ordinary meaning for the term

---

**7.** Although the court of appeals heavily relied on the Colorado Legislative Council's *Report to the Colorado General Assembly: Governmental Liability in Colorado*, Research Publication No. 134 at 140 (1968) [hereinafter *Report*], we decline to use the *Report* to decipher legislative intent for two reasons. First, although the *Report* may contain helpful guidance in other contexts, here, the *Report* contains no clear evidence of the legislature's intended meaning of the term "public facility"; at best, it is ambiguous. Second, the court of appeals misconstrued the section of the *Report* it cited. Specifically, the court of appeals utilized a section that evaluated the differences between two types of *dangerous conditions* as evidence that a *public facility* was meant to encompass individual objects, like a zip line. See *Loveland v. St. Vrain Valley Sch. Dist. RE–1J*, 2012 COA 112, ¶¶ 25–26, 328 P.3d 228. Additionally, we have relied on legislative history contained in sources other than the *Report* to determine if a parking lot qualifies as a "public

facility" because there was specific legislative history pertaining to public parking facilities. *Daniel v. City of Colorado Springs*, 2014 CO 34, ¶¶ 19–20, 327 P.3d 891. However, we lack such history here.

**8.** To meet the requirements of the recreation area waiver, the Lovelands must show that a "dangerous condition" existed on the playground. Because the entire collection of playground equipment here constituted a "public facility," a condition on the zip line may qualify as a "dangerous condition." *See* § 24–10–103(1.3), C.R.S. (2013) (defining "dangerous condition"). For example, the zip line could contain a "dangerous condition" if it had a rusty or obstructed track due to being negligently constructed or maintained by the District. Because the trial court made no findings of fact regarding the dangerous condition requirement, this Court cannot determine whether a dangerous condition existed.

"public facility," a dictionary definition cannot definitively resolve the question before us. While not dispositive, the dictionary definition of "facility" [9] serves as a useful starting point for our analysis by providing a lens for discerning legislative intent. *See Tidwell v. City & Cnty. of Denver*, 83 P.3d 75, 82 (Colo.2003) (citing the dictionary as the "appropriate source" from which to glean the meaning of "pursuit" in determining whether a police officer was immune from liability under the CGIA); *Fogg v. Macaluso*, 892 P.2d 271, 274 (Colo.1995) (endorsing the dictionary definition of the term "emergency" when interpreting a CGIA waiver). "Facility" is defined as "something that *promotes* the ease of any action, operation, transaction or course of conduct." *Webster's Third New International Dictionary* 812 (2002) (emphasis added) (providing the sample phrase of "excellent facilities for graduate study"). This definition of "facility" is evidence that the legislature did not intend the term to apply to individual items on public land, because such individual items merely represent alternative avenues for promoting the broader, common purposes that characterize facilities. Instead, the term "facility" applies to permanent, bricks-and-mortar structures (e.g., classroom buildings that promote graduate study), as well as to collections of individual items that, considered together, promote a broader, common purpose (e.g., a collection of individual pieces of playground equipment that together promote children's play).

¶ 20 Applying this purpose-based lens to a "swimming facility," also listed in section 24–10–106(1)(e), illustrates why an individual piece of equipment on public property does not qualify as a "facility" when it is divorced from the greater collection. One example of a "swimming facility" is a water park, which promotes (i.e., facilitates) outdoor water amusement for the public through its various individual components. For ex-

ample, water parks generally contain swimming pools, as well as a variety of individual rides (e.g., water slides or "lazy rivers") and auxiliary amenities (e.g., locker rooms, refreshment stands, and picnic areas). All of these individual rides and amenities—improvements to the land which collectively promote the common purpose of amusement—are what make a water park a "facility." Thus, stripped from the collective whole, a single water slide in a water park might be constructed or maintained such that a "dangerous condition" existed on the water slide, but the water slide would not itself qualify as a "facility." [10]

¶ 21 Just as the public water park promotes the common purpose of water amusement among patrons through its various individual components, a public playground promotes the common purpose of play and recreation among school children through its various individual components. For example, a playground typically features some combination of play equipment, such as swing sets, sand boxes, slides, monkey bars, merry-go-rounds, see-saws, or zip lines. Although the individual pieces of equipment each promote specific play activities (e.g., swinging or playing in the sand), they nevertheless collectively promote the common purpose of play and together make a playground a "facility" by virtue of the strong relationship between the individual components. And, just as the condition of an individual water slide in a water park might qualify as a dangerous condition but not as a "facility," the condition of an individual zip line on a playground might qualify as a dangerous condition but not as a "facility."

¶ 22 Our conclusion that an individual piece of playground equipment does not in and of itself qualify as a "facility" under the recreation area waiver is further bolstered by the statutory context. Under the well-worn canon of statutory construction *noscitur a sociis*, "a word may be known by the

---

9. While "public" and "facility" are each defined individually, the complete term ("public facility") is not defined. See *Webster's Third New International Dictionary* (2002).

10. We thus clarify the court of appeals' decision in *Anderson v. Hyland Hills Park & Recreation District*, 119 P.3d 533, 535 (Colo.App.2004), which erroneously held that an individual water ride at Water World, an outdoor water amusement park, constituted a "swimming facility" under section 24–10–106(1)(f).

company it keeps." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 287, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010). We have previously applied this canon in the CGIA context, looking to the other terms grouped in a CGIA waiver for helpful guidance when interpreting an individual statutory term. *See Hartsough*, 790 P.2d at 838 (implicitly applying *noscitur a sociis* by noting that "the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it"). In *Hartsough*, we considered whether the term "public hospital" in another CGIA waiver provision, section 24–10–106(1)(b), applied to a public *veterinary* hospital. *Id.* at 838. We held that the waiver only applied to hospitals that treated people, not animals, as "public hospitals are grouped together [in the waiver] with correctional facilities and jails, strongly suggesting that the section was intended to apply to public facilities designed to hold people." *Id.* Applying the same canon here, the term "public facility" is grouped together with public hospitals and jails, as well as public water, gas, sanitation, electrical, power, and swimming facilities. § 24–10–106(1)(e). The legislature's grouping of "public facility" with these other large and permanent structures which serve broader purposes (e.g., the provision of medical care, the production of electricity) strongly suggests that "public facility" was intended to include other large and permanent bricks-and-mortar structures, as well as collections of affixed, man-made items that promote a broader purpose on public property, such as a playground. It was not intended to apply to a single piece of equipment.

¶ 23 The statutory context is also illustrative here because the legislature included several other waiver provisions in the same statutory section where the recreation area waiver is codified. *See* § 24–10–106(1)(a)–(h) (listing waivers). In interpreting a statute, whenever possible, we give each word independent effect so that no word is rendered superfluous. *See City of Florence v. Bd. of Waterworks of Pueblo*, 793 P.2d 148, 151 (Colo.1990); *see also Dep't of Transp. v. Stapleton*, 97 P.3d 938, 943 (Colo. 2004) (noting that "we presume that the General Assembly understands the legal import of the words it uses and does not use language idly, but rather intends that meaning should be given to each word"). Under section 24–10–106, the term "facility" is used both in the recreation area waiver (subsection (1)(e)) and in a waiver that is applicable to injuries resulting from the operation and maintenance of certain public facilities (subsection (1)(f)). Importantly, the term "building" is used in a waiver applicable to injuries resulting from a "dangerous condition of any public building" (subsection (1)(c)). The legislature's use of "facility" in two waivers and "building" in a third indicates that it did not intend the term "facility" to be limited to a "building."

¶ 24 Because we assume that the General Assembly made intentional distinctions in the language it chose when crafting the CGIA, we conclude that the term "facility" has a different meaning than the term "building." As ordinary usage suggests, "building" has a more specific meaning than "facility"; indeed, a "building" can be a *type* of "facility." Thus, under the recreation area waiver, the term "facility" can be interpreted to include *both* a prototypical bricks-and-mortar structure, as well as a collection of items that serve a greater purpose, such a playground.

¶ 25 Moreover, our interpretation of "facility" comports with the underlying purposes of the CGIA. The CGIA is designed to protect taxpayers from excessive fiscal burdens and prohibitively expensive public services that could result from unlimited liability, while simultaneously providing an avenue for tort recovery in limited circumstances. *See generally* § 24–10–102 (providing declaration of legislative policy); § 24–10–106(1) (outlining specific waiver provisions). This delicate balance is "for the legislature alone to reach." *See Medina*, 35 P.3d at 453. If immunity were waived every time a public entity added a single piece of equipment to public land (e.g., one swing set), it would disrupt this balance by unjustifiably expanding liability under the recreation area waiver. Because such a result would not "best effectuate[ ] the intent of the General Assembly and the purposes of the legislative scheme," *Nieto*, 993

P.2d at 501, we decline to adopt such an interpretation here.

¶ 26 In sum, the court of appeals erred when it held that the *individual* zip line apparatus in and of itself—rather than the *entire collection* of playground equipment—constituted a "facility." As a result, we affirm the court of appeals on different grounds and hold that A.R.L.'s injury occurred on a "facility" because the zip line was a component of the larger playground.

## 2. A Playground That Is Accessible to the Public and Serves Beneficial Public Purposes Is "Public"

¶ 27 Having determined that the playground qualifies as a "facility," we now turn to the question of whether that same playground is also "public." The term "public" modifies—and constricts—the types of facilities that can qualify for the recreation area waiver; specifically, a "facility" must also be "public" to qualify for this waiver. We have previously considered the meaning of the word "public" under the CGIA in the context of a different waiver provision. *See Gallegos,* 916 P.2d at 511. In *Gallegos,* this Court considered whether water meter pits installed by the Denver Water Department on individual, private properties qualified as "public" water facilities under section 24–10–106(1)(f). *Id.* In ultimately concluding that the water meter pits were not "public" facilities, we held that a facility is "public" if it is both accessible to the general public and operated for the benefit of the public. *Id.* at 511–12.

¶ 28 Unlike the water meter pits at issue in *Gallegos,* which were "used for the sole benefit of the property on which they [were] located and [were] not beneficial to the general public," the playground where A.R.L. was injured was designed to benefit successive cohorts of public school children (i.e., to provide space for play and recreation). Moreover, there is no evidence that the general public was prevented from using the playground during non-school hours (for example, neighborhood parents might bring their children there to play on evenings, weekends, or during school breaks). We hold that for a facility to be "public" under section 24–10–106(1)(e), it must be accessible to the public and maintained by a public entity [11] to serve a beneficial public purpose. The playground facility at issue here meets these requirements, and thus, it qualified as a "public" facility under the recreation area waiver.

## B. The Playground At Issue Here Is "Located In" a "Recreation Area"

¶ 29 Having determined that the Lovelands meet the "public facility" requirement, we now determine whether the public facility is "located in" a "recreation area."

¶ 30 In determining whether a particular piece of property is "located in" a "recreation area," we employ a three-step analysis. *Daniel,* ¶ 23. First, we determine what property is relevant to our analysis by determining the boundaries of the "putative recreation area." *Id.* We do so by including any contiguous areas of public property that plausibly promote recreation and excluding any pieces of property that clearly do not promote recreation. *Id.* Second, we determine if the public entity's "primary purpose" in constructing or maintaining the recreation area is recreational. *Id.* Third, assuming the primary purpose is recreational, we determine whether the public facility at issue was located in the boundaries of this recreation area. *Id.*

¶ 31 Applying this three-step analysis to the case at bar, we conclude that the playground (in which the zip line was built) was "located in" a "recreation area." Looking first to the putative recreation area requirement, we conclude that the recreation area here was the contiguous property underlying the playground equipment. We exclude the property underlying the school because the school is designed to promote educational, not recreational, activities. *See id.* at ¶ 24 (explaining that if an electrical

11. It is important to note that we have previously held that a structure can be built by an independent contractor, rather than a public entity, and still qualify for a CGIA waiver. See *Springer,* 13 P.3d at 802.

facility were located on public land directly next to a public golf course, the electrical facility would not render the golf course any less of a "recreation area," and that it should be excluded from the putative recreation area because its purpose is the production of electricity, not the promotion of recreation). While some occasional recreation may occur inside of the school—e.g., children playing in the hallways on their way to recess—such impromptu recreation does not render the school a "recreation area." *See Young*, ¶ 30 (explaining that impromptu recreation by children on a walkway adjacent to a playground does not render that walkway part of the playground that qualifies as a "public facility" in a "recreation area").

¶ 32 Second, we determine the "primary purpose" of the recreation area. Although there are some hypothetical non-recreational uses of the playground (for example, a science class might visit the playground to demonstrate a particular scientific concept),[12] it is safe to assume that the principal, i.e., primary, purpose of the school in constructing or maintaining this area was to allow school children to play during their recess time. Accordingly, the primary purpose of the area was recreation.

¶ 33 Third, we determine if the public facility was "located in" the recreation area. It is uncontested that the collection of playground equipment at issue in this case (i.e., the "public facility") was physically situated within the boundaries of the recreation area (i.e., the land underlying the playground equipment).

¶ 34 In sum, the Lovelands meet section 24–10–106(1)(e)'s requirement that the "public facility" be "located in" the "recreation area."

## IV. Conclusion

¶ 35 We hold that a collection of playground equipment at a public school qualifies as a "public facility" under the recreation area waiver because it is (1) relatively permanent or otherwise affixed to the land, (2) a man-made structure, (3) accessible to the public, and (4) maintained by a public entity to serve a beneficial, common public purpose. A.R.L.'s injury occurred on a "facility" because she was injured on a zip line, a component of the playground that *constitutes a facility*. Her injury occurred on a "public" facility because the playground was accessible and beneficial to both the greater public and the public school children attending A.R.L.' s elementary school.

¶ 36 Additionally, pursuant to the three-step analysis employed in *Daniel*, ¶ 23, we determine that the land underlying the playground equipment was the relevant "putative recreation area," that the "primary purpose" of that area was recreation, and that the playground where A.R.L. was injured was "located in" that area. Therefore, we hold that the public facility here, i.e., the collection of playground equipment, was "located in" the "recreation area" that was the school playground.

¶ 37 We remand for further proceedings consistent with this opinion.

JUSTICE COATS dissents, and JUSTICE EID joins in the dissent.

JUSTICE COATS, dissenting.

¶ 38 Largely for the reasons outlined in my separate opinion in *Daniel v. City of Colorado Springs*, 2014 CO 34, ¶¶ 35–49, 327 P.3d 891 (Coats, J., concurring), also announced today, I disagree with the majority's understanding of the terms "public" and "facility," as those terms are used in the Colorado Governmental Immunity Act, as well as the majority's framework for assessing whether a public facility is "located in any park or recreation area maintained by a public entity." Because I further believe that when considered under a proper interpretation of the Act, the record below does not support a finding that either the zip line or the playground in question constitutes a "public facility" at all, much less one "located in a park

---

12. Because the non-recreational purpose here is purely hypothetical, our "primary purpose" analysis is distinguishable from the "primary purpose" analysis in *Daniel*, ¶ 27, n. 6, where a golf course had clear recreational purposes (i.e., golfing) and clear non-recreational purposes (i.e., hosting community events in the golf course's clubhouse).

or recreation area maintained by a public entity," I would reverse the judgment of the court of appeals. I therefore respectfully dissent.

¶ 39 I understand the majority to reason that although the zip line on which the child was playing in this case is not itself a facility, the entire collection of playground equipment making up the playground qualifies as a public facility and the land underneath the playground qualifies as a recreation area maintained by a public entity; and therefore a dangerous condition of the zip line would constitute a "dangerous condition of any ... public facility located in any park or recreation area maintained by a public entity," for which sovereign immunity is waived by section 24–10–106(1)(e), C.R.S. (2013). Although I consider the majority's "public facility" analysis misguided, even if it were correct, I believe the majority's conclusion would still fail, for the overriding reason that nothing in the record suggests the school playground in which the zip line was located was designated, operated, or maintained as a park or recreation area by the school district, in a manner prescribed by statute.

¶ 40 As I indicated in my concurring opinion in *Daniel,* I consider it manifest that a "recreation area maintained by a public entity," just as a "park," refers only to those areas designated and maintained by a public entity *as a recreation area,* as permitted by statute or the provisions of the entity's own regulations governing the creation, operation, and maintenance of such areas. Article 7 of title 29, entitled "Recreational Facilities Districts," authorizes any "city, town, village, county, metropolitan recreational district, or park and recreation district organized under article 1 of title 32, C.R.S.," as well as "any school district," to "acquire, sell, own, exchange, and operate public recreation facilities, open space and parklands, playgrounds, and television relay and translator facilities." §§ 29–7–101(1), –102(1), C.R.S. (2013). In addition, school districts are statutorily singled out as being authorized to "operate a system of public recreation and playgrounds and television relay translator facilities." § 29–7–102(1). Beyond all these powers conferred on school districts, a school district is capable of acquiring the status of "special district" as defined in section 29–21–101(1)(g), C.R.S. (2013), that is "[a] special district organized under article 1 of title 32, C.R.S., which provides park or recreation facilities or programs pursuant to the district's service plan, which facilities or programs are open to public use," § 29–21–101(1)(g)(I).

¶ 41 Although school districts are clearly public entities, as to which sovereign immunity was statutorily reinstated by the Act, unlike public hospitals, jails, or correctional, water, gas, sanitation, electrical, power, or swimming facilities, schools are not among those public institutions or facilities as to the very operation and maintenance of which immunity is waived. *See* § 24–10–106. Rather, sovereign immunity for school districts appears to be waived only to the extent that one of the "dangerous condition" waivers of the Act, such as the waiver for dangerous conditions of a public building, a sidewalk, or a public facility of a park or recreation area, could be found applicable. *See id.* Perhaps because of their funding through a unique dual state/local taxation system, *see State v. Lobato,* 2013 CO 30, ¶¶ 25–28, 304 P.3d 1132; *Bd. of Cnty. Comm'rs v. State,* 203 P.3d 519, 527–28 (Colo.2009), school districts, as compared with other public entities, are clearly singled out for different treatment by the Act, *see, e.g.,* § 24–10–115(3), C.R.S. (2013) (*authorizing* all public entities "except the state and school districts" to establish insurance reserve funds but *mandating* that school districts do so).

¶ 42 With regard to the park-or-recreation-area waiver at issue in this case, *see* § 24–10–106(1)(e), although the school district would have been statutorily authorized to do so, nothing in the record suggests that it operated the school playground in question as part of a system of "public recreation and playgrounds," provided "pursuant to the district's service plan, which facilities or programs are open to public use," *see* §§ 29–7–102(1), –101(g). Unlike a community gymnasium, or swimming pool, or recreation center, for example, operated by a school district for public use, the record appears to indicate that the playground in question was simply a

portion of a public school ground, provided for the use of school children in conjunction with their matriculation at a public school. Whether or not there was evidence that members of the public were barred from the area when not being used by the school, *see* maj. op. ¶ 28, is hardly relevant to the question whether the playground qualified as either a public facility or a park or recreation area.

¶ 43 Finally, with regard to the majority's public-facility analysis, as I indicated in my alternate opinion in *Daniel*, I disagree with the majority's understanding of the Act's use of both "facility" and "public." I do not agree with, and in fact find extremely unmanageable, the majority's scheme distinguishing those man-made objects qualifying as facilities from those not so qualifying, and instead I would find the zip line itself to be a facility simply because (like the swing set example used in the 1968 Legislative Council Report, *see Colo. Legislative Council, Report to the Colorado General Assembly: Governmental Liability in Colorado*, Research Publication No. 134 at 140 (1968)) it was a man-made rather than natural object. As I also indicated in my opinion in *Daniel*, however, I would not find a definition of the term "public" devised by this court in assessing whether a particular water facility was a "public water facility" meaningful in determining whether a facility of a park or recreation area is a "public facility"; and in any event, I would not find that the school playground in this case, whether or not accessible to the public, to be for the benefit of the public. In the context of a park or recreation area, I think instead that a "public facility" refers to a facility that is for the use and enjoyment of the public in general, or as the statutes governing a school district's authorization "to operate a system of public recreation and playgrounds" put it, "facilities and programs [that] are open to the public." *See* §§ 29–7–102(1), –101(g)(I).

¶ 44 Because I would therefore reverse the judgment of the court of appeals and order reinstatement of the district court's summary judgment, I respectfully dissent.

I am authorized to state that JUSTICE EID joins in this dissent.