The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

2016 CO 41
Supreme Court Case No. 14SC224
Certiorari to the Colorado Court of Appeals
Court of Appeals Case No. 13CA517
Petitioner:
Salynda E. Fleury, individually on behalf of Indyka Norris and Sage Norris, and as
surviving spouse of Christopher H. Norris,
v.
Respondent:
IntraWest Winter Park Operations Corporation.
Judgment Affirmed
en banc
May 31, 2016
Attorneys for Petitioner:
Burg Simpson Eldredge Hersh & Jardine, PC
James G. Heckbert
Diane Vaksdal Smith
Nelson P. Boyle
Englewood, Colorado
Attorneys for Respondent:
Rietz Law Firm, LLC Peter W. Rietz
Kimberly A. Viergever Brian A. Birenbach
 Dillon, Colorado
Attorney for Amici Curiae Association of Professional Patrollers and Fédération
Internationale des Patrouilles de Ski:
Gassman Law Firm LLC and Community Legal Center
Edward C. Gassman
Loveland, Colorado
Attorneys for Amicus Curiae Colorado Ski Country USA, Inc.:
Davis Graham and Stubbs LLP
Jordan Lipp
John M. Bowlin Denver, Colorado
Colorado Ski Country USA, Inc. Melanie Mills
Denver, Colorado
Attorney for Amicus Curiae Colorado Trial Lawyers Association:
Heideman Poor LLC
John F. Poor
Denver, Colorado

JUSTICE EID delivered the Opinion of the Court.
JUSTICE MÁRQUEZ dissents, and JUSTICE GABRIEL joins in the dissent.
¶1     In this case, we determine whether an avalanche that occurs within the bounds
of a ski resort qualifies as an “inherent danger and risk of skiing” under the Ski Safety Act of 1979, §§ 33-44-101 to -114, C.R.S. (2015) (the “SSA” or “Act”). If so, the statute would preclude skiers from bringing claims against ski area operators for injuries resulting from these kinds of avalanches. See § 33-44-112, C.R.S. (2015).
¶2     Here, petitioner Salynda E. Fleury brought a negligence and wrongful death suit against respondent IntraWest Winter Park Operations Corporation (“Winter Park”) after her husband was killed in an in-bounds avalanche at its resort. Fleury claims that, although Winter Park knew that avalanches were likely to occur in the area where her husband was skiing that day, it neither warned skiers about this risk nor closed the area. Winter Park filed a motion for a determination of law under C.R.C.P. 56(h) and for judgment on the pleadings under C.R.C.P. 12(c), arguing that in-bounds avalanches are an inherent risk of skiing as defined in the SSA and that the SSA therefore precluded the lawsuit. The trial court agreed and dismissed the action pursuant to section 33-44-112.
¶3     The court of appeals affirmed the dismissal in a split decision. The majority concluded that avalanches fall within the statutory meaning of the phrase “inherent dangers and risks of skiing” because they result from “snow conditions as they exist or may change,” “changing weather conditions,” and “variations of steepness or terrain,” all of which are specifically enumerated as “inherent dangers and risks” under the statutory definition. Fleury v. IntraWest Winter Park Operations Corp., 2014 COA 13, ¶¶ 15–16, __ P.3d __. Judge J. Jones dissented, arguing that the statute neither expressly nor by clear implication included in-bounds avalanches as an inherent risk of skiing. Id. at ¶ 29 (J. Jones, J., dissenting).
¶4     We granted certiorari and now affirm. The definition of “inherent dangers and risks of skiing” in section 33-44-103(3.5), C.R.S. (2015), specifically includes “snow conditions as they exist or may change.” This phrase encompasses an in-bounds avalanche, which is, at its core, the movement, or changing condition, of snow. We therefore affirm the decision of the court of appeals.
I.
¶5     We accept as true the following allegations from the complaint. See Melat, 
Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C., 2012 CO 61, ¶ 7, 287 P.3d 842, 845 (citing Abts v. Bd. of Educ., 622 P.2d 518, 521 (Colo. 1980)).
¶6     On January 22, 2012, Christopher H. Norris was killed in an avalanche while skiing on the “Trestle Trees” run within the bounds of Winter Park Resort. In the days leading up to his death, the Colorado Avalanche Information Center had predicted heavy snow storms and issued an avalanche warning to last through January 23. It warned skiers to “[b]e careful near or below any slope over 30 degrees” and cautioned that “the weak snowpack will not be able to handle even [a] modest new load” of snow from the coming storms. Prior to the arrival of these storms, the existing snow base on the Trestle Trees run had grown weak and unstable, which made it prone to avalanches. Winter Park knew about the avalanche warnings, the unstable snow on the Trestle Trees run, and the areas within the resort that were most susceptible to avalanches on January 22, including Trestle Trees, but it neither closed the run nor posted signs to warn skiers of the avalanche risk.
¶7     After her husband’s death, Fleury brought negligence and wrongful death claims against Winter Park. Winter Park filed a motion for a determination of law under C.R.C.P. 56(h) and for judgment on the pleadings under C.R.C.P. 12(c), arguing that the SSA barred the lawsuit because avalanches constitute an inherent risk of skiing under the statutory definition.
¶8     The trial court granted the motion. It found that the allegations in the complaint indicated that the fatal avalanche resulted from a combination of “changing weather conditions,” “snow conditions,” and “variations in steepness or terrain” as enumerated in section 33-44-103(3.5). The court rejected Fleury’s argument that the statute needed to expressly enumerate the term “avalanches” for avalanches to be covered as an inherent risk because section 33-44-103(3.5) uses the non-exclusive term “including” before listing examples of inherent risks. As such, it dismissed the complaint with prejudice.
¶9     In a split decision, the court of appeals affirmed the dismissal. Fleury, ¶ 28. The majority agreed with the trial court that the word “including” was “illustrative and not, as Ms. Fleury argues, confined to the identified dangers” in the statute because it is “a word of extension or enlargement.” Id. at ¶ 11. It went on to conclude that avalanches result “from certain conditions of snow, and the degree of danger is affected by ‘changing weather conditions’ across ‘variations of steepness or terrain.’” Id. at ¶ 15. Consequently, the court held that the term “inherent dangers and risks of skiing” under section 33-44-103(3.5) encompasses avalanches. Id. at ¶ 16.
¶10      In dissent, Judge Jones objected that the majority “cobbl[ed] together three categories of covered dangers and risks” to conclude that avalanches are covered under the definition even though they are not expressly included in it. Id. at ¶ 38 (J. Jones, J., dissenting). He argued that this approach violated the rule that statutory grants of immunity must be strictly construed, and characterized an avalanche as an “event—one that not even necessarily involves snow,” as distinguished from “changing weather conditions,” “snow conditions,” or “variations in steepness or terrain.” Id. at ¶¶ 38, 42, 43–45. Finally, Judge Jones asserted that avalanches do not always result from the mere combination of these three factors, because other factors, including human action, can also cause them independently. Id. at ¶ 46. Thus, even if the majority was correct to aggregate the different categories under the statute, Judge Jones contended that the statute still did not unambiguously encompass avalanches. Id. at ¶ 48. For these reasons, he would have reversed the trial court. Id. at ¶ 29.
¶11      We granted certiorari to review the court of appeals’ decision and now affirm.1 The statutory definition specifically lists “snow conditions as they exist or may change” as an “inherent danger and risk of skiing.” § 33-44-103(3.5). This phrase encompasses an in-bounds avalanche, which is, at its core, the movement, or changing condition, of snow. We therefore hold that an in-bounds avalanche qualifies as an inherent risk of skiing under the SSA.2
II.
¶12      Whether the term “inherent dangers and risks of skiing” as defined in section 33-44-103(3.5) encompasses in-bounds avalanches is a question of statutory interpretation that we review de novo. Hunsaker v. People, 2015 CO 46, ¶ 11, 351 P.3d 388, 391.
¶13      The SSA recognizes that certain dangers and risks “inhere in the sport of skiing, regardless of any and all reasonable safety measures which can be employed” by ski area operators. § 33-44-102, C.R.S. (2015). It therefore provides that “no skier may make any claim against or recover from any ski area operator for injury resulting from any of the inherent dangers and risks of skiing.” § 33-44-112.3 The Act specifically defines “inherent dangers and risks of skiing” as
those dangers or conditions that are part of the sport of skiing, including changing weather conditions; snow conditions as they exist or may change, such as ice, hard pack, powder, packed powder, wind pack, corn,
crust, slush, cut-up snow, and machine-made snow; surface or subsurface conditions such as bare spots, forest growth, rocks, stumps, streambeds, cliffs, extreme terrain, and trees, or other natural objects, and collisions
with such natural objects; impact with lift towers, signs, posts, fences or enclosures, hydrants, water pipes, or other man-made structures and their components; variations in steepness or terrain, whether natural or as a result of slope design, snowmaking or grooming operations, including but not limited to roads, freestyle terrain, jumps, and catwalks or other terrain modifications; collisions with other skiers; and the failure of skiers to ski within their own abilities.
§ 33-44-103(3.5) (emphasis added). The Act specifically excludes “the negligence of a ski area operator as set forth in section 33-44-104(2)” from this definition and does not immunize operators for “injur[ies] caused by the use or operation of ski lifts.” Id. 
¶14      The phrase “snow conditions as they exist or may change” encompasses avalanches that occur within the bounds of a ski resort. A “condition” is simply a “mode or state of being,” Webster’s Third New International Dictionary 473 (2003), or more specifically, “the physical state of something,” Merriam–Webster Online Dictionary, https://perma.cc/E4DZ-9UZA. A “snow condition,” therefore, is simply a “mode or state of being” or “the physical state” of snow. To put it differently, a snow condition is a description of the snow at any given time. Section 33-44-103(3.5) lists “ice, hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, and machine-made snow” as examples of snow conditions—that is, ways in which to describe the physical state of the snow at any particular time.
¶15      The statute also contemplates that the snow conditions “may change.” § 33-44-103(3.5) (listing “snow conditions as they exist or may change” as an inherent risk of skiing (emphasis added)). One obvious way in which a snow condition “may change” is through movement of the snow, including by wind and gravity. And at its core, an avalanche is moving snow caused by gravity. The dictionary definition of “avalanche” is “a large mass of snow, ice, earth, rock, or other material in swift motion down a mountainside or over a precipice.” Webster’s Third New International Dictionary 150 (2003); see also The American Heritage Dictionary of the English Language 383 (4th ed. 2000) (defining “avalanche” as “[a] fall or slide of a large mass, as of snow or rock, down a mountainside”). Although this definition could include snowless rockslides or landslides, “[i]n practice, [‘avalanche’] usually refers to the snow avalanche.” Nat’l Oceanic and Atmospheric Admin., Avalanche, Nat’l Weather Serv. Glossary, https://perma.cc/VYR3-CXAZ; see also Nat’l Avalanche Ctr., Avalanche, Encyclopedia, https://perma.cc/LRR7-K782 (defining “avalanche” as “[a] mass of snow sliding, tumbling, or flowing down an inclined surface” and explaining the types
of avalanches, all of which involve moving snow).     These sources confirm that an avalanche is most commonly understood as the movement of snow down a mountainside or other incline.
¶16      At bottom, then, an avalanche is one way in which snow conditions may change. As alleged here, snow conditions started with fresh snow on unstable snowpack, and, within moments, changed to a mound of snow at the bottom of the incline. We therefore conclude that Norris’s death is alleged to have been caused by changing snow conditions.
¶17      Adopting the reasoning of the dissenting judge below, Fleury argues that an avalanche is “an event,” not a snow condition, and that therefore an avalanche does not fall within the statutory language. See Fleury, ¶ 42 (J. Jones, J., dissenting). This interpretation, however, ignores the fact that the language covers snow conditions as they “exist” or “may change.” Because an avalanche is, at its essence, the movement of snow, and is therefore a way in which snow conditions may change, we hold that section 33-44-103(3.5) covers in-bounds avalanches. It follows that section 33-44-112 precludes skiers from suing operators to recover for injuries resulting from in-bounds avalanches.4
III.
¶18      For these reasons, we affirm the decision of the court of appeals.
JUSTICE MÁRQUEZ dissents, and JUSTICE GABRIEL joins in the dissent.
JUSTICE MÁRQUEZ, dissenting.
¶19      Today the majority holds that an avalanche that kills a skier on a designated, open run at a ski area is nothing more than a “changing snow condition,” maj. op. ¶ 16, and thus one of the “inherent dangers and risks of skiing” for which ski resorts are immune from liability under the Ski Safety Act of 1979, §§ 33-44-101 to -114, C.R.S. (2015) (the “SSA”). To arrive at this conclusion, the majority construes the statutory phrase “snow conditions as they . . . may change” in section 33-44-103(3.5) to encompass the movement of snow, “including by wind and gravity,” maj. op. ¶ 15, such that an avalanche—the swift sliding or tumbling of a large mass of snow, ice, earth, rock, or other material down a mountain incline—is merely a “change” in the “condition” of the snow. Because the majority’s construction of section 33-44-103(3.5) is wholly unconvincing, I respectfully dissent.
I. Principles of Statutory Construction
¶20      We review issues of statutory interpretation de novo. Robinson v. Colo. State Lottery Div., 179 P.3d 998, 1003 (Colo. 2008). When interpreting language in a statute, courts are guided by familiar principles of statutory construction. Our aim is always to ascertain and give effect to the General Assembly’s intent. Roup v. Commercial Research, LLC, 2015 CO 38, ¶ 8, 349 P.3d 273, 275. We give words their plain and ordinary meaning, id., and we examine the statutory language in the context of the statute as a whole, Foiles v. Whittman, 233 P.3d 697, 699 (Colo. 2010). We will not read into a statute language that does not exist. Boulder Cty. Bd. of Com’rs v. HealthSouth Corp., 246 P.3d 948, 954 (Colo. 2011). Finally, “when the legislature speaks with exactitude, we must construe the statute to mean that the inclusion or specification of a particular set of conditions necessarily excludes others.” Lunsford v. W. States Life Ins., 908 P.2d 79, 84 (Colo. 1995).
II. The Ski Safety Act
¶21     The purpose of the Ski Safety Act is to define the legal responsibilities, rights, and liabilities of ski area operators and of the skiers who use their facilities. § 33-44-102, C.R.S. (2015); Bayer v. Crested Butte Mountain Resort, Inc., 960 P.2d 70, 74 (Colo. 1998). Because certain dangers “inhere in the sport of skiing,” § 33-44-102, the General Assembly has limited ski area operators’ tort liability by granting them immunity for “injury resulting from any of the inherent dangers and risks of skiing,” § 33-44-112, C.R.S. (2015). The SSA defines “inherent dangers and risks of skiing” in section 33-4-103(3.5), C.R.S. (2015), listing seven categories of hazards: (1) “changing weather conditions,” (2) “snow conditions as they exist or may change,” (3) “surface or subsurface conditions,” (4) impact with natural and man-made objects commonly encountered on the slopes, (5) “variations in steepness or terrain,” (6) “collisions with other skiers,” and (7) “the failure of skiers to ski within their own abilities.”1
¶22      The provision further elucidates some of these categories through examples. For instance, “surface or subsurface conditions” include “bare spots, forest growth, rocks, stumps, streambeds, cliffs, extreme terrain, and trees, or other natural objects, and collisions with such natural objects.” Id. “[V]ariations in steepness or terrain” include but are not limited to “roads, freestyle terrain, jumps, and catwalks or other terrain modifications.” Id. And the statute describes “impact” with specific objects, namely “lift towers, signs, posts, fences or enclosures, hydrants, water pipes, or other man-made structures and their components.” Id. Relevant here, “snow conditions as they exist or may change” means conditions such as “ice, hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, and machine-made snow.” Id. Given the extensive list of inherent dangers in section 33-44-103(3.5), skiers and snowboarders assume much of the risk of engaging in snow sports, even within the boundaries of a ski area. And yet, nowhere in the statute does the term “avalanche” appear.
¶23      The majority nevertheless concludes that the statutory phrase “snow conditions as they . . . may change” in section 33-44-103(3.5) encompasses the “movement” of snow, maj. op. ¶ 15, such that an avalanche is simply a “change” in the “condition” of the snow. This interpretation is untenable for a host of reasons.
¶24      As an initial matter, because the SSA’s grant of immunity to ski area operators abrogates remedies available at common law, we must construe the statute strictly. Henisse v. First Transit, Inc., 247 P.3d 577, 579 (Colo. 2011). Thus, “if the legislature wishes to abrogate rights that would otherwise be available under the common law, it must manifest its intent either expressly or by clear implication.” Vigil v. Franklin, 103 P.3d 322, 327 (Colo. 2004).
¶25      Although the majority does not address the issue, Winter Park contends that section 33-44-103(3.5) must be construed broadly because it introduces the categories of dangers and risks with the word “including.” Ordinarily, the word “including” is construed expansively, such that placing “including” before a list of examples does not confine the meaning of the term to the specific examples listed. Preston v. Dupont, 35 P.3d 433, 438 (Colo. 2001).
¶26      However, viewed in the context of section 33-44-103 as a whole, the use of the term “including” at the beginning of subsection (3.5) does not function to expand the list of “inherent dangers and risks of skiing” that follow; rather, it serves to limit it. Elsewhere in section 33-44-103, which provides the definitions for terms used in the SSA, the General Assembly used “including” coupled with expansive language. For example, “Freestyle terrain” “includes, but is not limited to,” terrain parks and other features. § 33-44-103(3.3). “Skiing” “includes, without limitation,” all manner of snow sports. § 33-44-103(8). A “skier” is a person who uses the facilities of a ski area, “including but not limited to” ski slopes and trails. Id. Most significantly, subsection (3.5), the provision at issue here defining the “inherent dangers and risks of skiing,” describes “variations in steepness or terrain” as “including but not limited to” various types of natural and man-made terrain. § 33-44-103(3.5). In contrast, the General Assembly omitted this expansive additional language from the term “including” at the head of subsection (3.5). Courts must presume that the legislature did not make this choice idly; instead, “the use of different terms signals an intent on the part of the General Assembly to afford those terms different meanings.” Robinson, 179 P.3d at 1010. Thus, we can infer from the language of section 33-44-103 as a whole that the term “including” as used at the beginning of subsection (3.5) was intended to limit, not expand, the list of “inherent dangers and risks of skiing” that follow.
¶27      The history of this provision confirms this legislative intent. When first introduced, the 1990 amendment that added what is now subsection (3.5) defined “inherent dangers and risks of skiing” as those dangers or conditions “including, but not limited to,” various hazards. However, in comments before the House Committee on State Affairs, Representative McInnis, a sponsor of the bill, explained that the original bill was amended to remove the phrase “but not limited to,” and that this change was intended to narrow the provision:
We have stricken the words ‘but not limited to,’ so that it simply reads,  ‘the sport of skiing, including,’ and then it goes on to say, ‘changing weather conditions, snow conditions,’ and so forth. . . . It’s a slight narrowing of the amendment, and it’s a clarification that the items that  follow are the inherent risks and dangers that are being referred to.
Hearing on S.B. 90-80 Before the H. Comm. on State Affairs, 57th Gen. Assemb., 2nd Sess. (March 13, 1990) (statement of Rep. McInnis) (emphases added). In short, given this legislative intent, and given that the SSA abrogates the common law, we must construe the “inherent dangers and risks” in section 33-44-103(3.5) narrowly.
¶28      Second, as a matter of statutory construction and common sense, I simply cannot agree with the majority that the phrase “snow conditions as they . . . may change” can be construed to encompass the “movement” of snow. Maj. op. ¶¶ 15–16. The majority acknowledges that the term “condition” means “simply a ‘mode or state of being,’ or more specifically, ‘the physical state of something.’” Id. at ¶ 14 (citation omitted). I agree. Logically, then, a snow “condition” refers to the physical state of snow, as illustrated by the examples listed in the statute: “ice, hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, and machine-made snow.” § 33-44-103(3.5). Each example describes a physical property or quality of the snow itself. On any given day on the slopes, skiers necessarily encounter one or more of these snow conditions.
¶29      By contrast, an avalanche is “an event—one that not even necessarily involves snow.” Fleury v. IntraWest Winter Park Operations Corp., 2014 COA 13 (J. Jones, J., dissenting). In short, an avalanche is not a “physical state” of snow but a term that describes the movement of snow. Indeed, the majority recognizes that an avalanche describes an episode: a “fall or slide of a large mass . . . down a mountainside,” or a “mass of snow sliding, tumbling, or flowing down an inclined surface.” Maj. op. ¶ 15. Yet subsection (3.5) does not include the “movement” of snow among the “inherent dangers and risks” of skiing. Under the canon of statutory construction known as noscitur a sociis, “a word may be known by the company it keeps.” St. Vrain Valley Sch. Dist. RE-1J v. A.R.L., 2014 CO 33, ¶ 22, 325 P.3d 1014, 1021–22 (applying the canon by looking to the other terms grouped in a Colorado Governmental Immunity Act waiver for guidance in interpreting the term “public facility”). Here, the term “snow conditions” plainly refers to the physical state or quality of the snow itself: powder, packed powder, ice, slush, etc. Applying the canon of noscitur a sociis, a snow “condition” does not also contemplate the “movement” of snow—a wholly different concept. Indeed, in its own version of the SSA, the Idaho legislature recognized the obvious distinction between snow “conditions” and the “movement” of snow by separately providing that skiers assume the risk for both “snow or ice conditions” and “any movement of snow including, but not limited to, slides, sloughs or avalanches.” Idaho Code Ann. § 6-1106 (2015) (emphases added).
¶30      The majority nevertheless concludes that the phrase “snow conditions as they exist or may change” in subsection (3.5) encompasses the movement of snow by reasoning that the avalanche that killed Salynda Fleury’s husband was merely a “changing condition” of snow. But as discussed above, the “condition” of the snow refers to its physical quality (powder, ice, slush)—not an event, and not the snow’s location (piled on a precipice, nestled in tree branches, or lying at the base of a mountain). Consequently, a “change” in the “condition” of the snow under subsection (3.5) does not refer to a change in its location—or as the majority puts it, from “fresh snow on unstable snowpack” to “a mound of snow at bottom of the incline.” Maj. op. ¶ 16. Rather, a “change” in the “condition” of the snow simply refers to changes from one physical state or quality to another. Over the course of a few days or even a few hours, fresh “powder” can change to “packed powder.” A storm can change “hard pack” back to deep “powder.” On a spring day, “ice” can change to “hard pack,” to “slush,” and so on. But a “change” in the “condition” of snow hardly contemplates a change in the snow’s location, let alone an event like an avalanche. Accordingly, I simply cannot subscribe to the majority’s logic that the General Assembly intended “snow conditions as they exist or may change” to include avalanches.
¶31      Finally, the majority’s construction of this phrase cannot be squared with the remainder of the statute. The many hazards listed in section 33-44-103(3.5) as “inherent dangers and risks of skiing” are common, everyday conditions that any skier or snowboarder reasonably can expect to encounter on open portions of in-bounds ski areas. Importantly, each of these hazards represents dangers or risks that are either largely within a skier’s control (e.g., avoiding collisions with objects or other skiers, skiing within ability) or capable of being perceived, anticipated, assessed, and generally avoided by the skier’s choice (e.g., weather conditions, snow conditions, or terrain). See § 33-44-103(3.5).
¶32      But an avalanche is categorically different. Unlike weather, snow conditions, or terrain, the average skier lacks the training or resources to perceive and assess the risk of an avalanche on any given slope on any given day. Notably, the SSA allocates to ski area operators the risk of other hazards that fall outside of a skier’s ability to control or anticipate, but are within the ability of the ski area operator to mitigate or reasonably protect skiers therefrom. These include any “injury caused by the use or operation of ski lifts,” id., and injuries resulting from a ski area operator’s violation of SSA requirements like posting informative signage, § 33-44-106, C.R.S. (2015). Yet the majority’s construction of “snow conditions as they exist or may change” runs contrary to the rest of subsection (3.5) and allocates the risk of injury and death from an in-bounds avalanche not to ski area operators—which have the information, expertise, and resources to perceive and mitigate avalanche danger and protect skiers—but instead to the skiing public, which does not.
¶33      Perhaps the majority assumes that in-bounds avalanches can occur only on expert runs or in back bowl areas and that experienced skiers who venture onto steep, snowy slopes are knowledgeable about avalanche danger and rightly should assume the risk. However, the Trestle Trees area where Christopher Norris died was not a backcountry area but rather an open, designated run at Winter Park. Further, many expert slopes join beginner trails near the base of the mountain or have beginner-level catwalks that cross the expert runs. Under today’s holding, even a family of novice skiers traversing the mountain must be expected to look uphill, gauge the steepness of the slope, the quantity of fresh snow, and the multitude of other factors that avalanche forecasters consider, and assume the risk of being swept away by an avalanche.
¶34      Fleury alleges that Winter Park knew or should have known that the Trestle Trees area was likely to experience dangerous avalanches on the day of Norris’s death because avalanche warnings predicted heavy snows on a weak and unstable snowpack. Maj. op. ¶ 6. Despite these warnings, Winter Park neither closed the Trestle Trees nor warned skiers of the avalanche risk. Id. Certainly, ski area operators have ample incentive to mitigate the risk of avalanches and to protect skiers within their ski areas, lest the public take their ski vacations elsewhere. And without question, ski area operators go to great lengths to mitigate avalanche risk. But after today’s holding, Winter Park effectively has no duty at all to warn skiers of avalanche risk or to close a dangerous run based on such risk: the SSA does not require ski area operators to mitigate avalanches or to issue avalanche warnings, and the majority’s ruling today abrogates any common law duty of care to do so.2 In fact, under today’s holding, a ski area operator will be immune from liability for injuries from avalanches regardless of the circumstances—arguably even for avalanches triggered by the operator’s own negligent or reckless actions.3

¶35      I note that my view of section 33-44-103(3.5) does not lead to unlimited liability for ski area operators. A plaintiff such as Fleury still must prove Winter Park’s negligence, and it is likely that ski area operators’ mitigation efforts ordinarily would meet any reasonable duty of care. Moreover, the SSA limits ski area operators’ liability in other ways, including a two-year statute of limitations for all actions to recover damages for injury caused by the maintenance, supervision, or operation of a ski area, § 33-44-111, C.R.S. (2015), and a one-million-dollar cap on damages that may be recovered by a skier injured while using a ski area, § 33-44-113, C.R.S. (2015).
¶36      In sum, although the General Assembly easily could have added “avalanches” to its extensive list of inherent dangers and risks in subsection (3.5), it chose not to. Unlike the majority, I would not add words to that provision to create immunity where none presently exists but would instead leave that decision to the legislature.4 Because the existing statutory definition of “inherent dangers and risks of skiing” does not include avalanches, and because I cannot accept the majority’s strained logic that an avalanche is merely a “change” in the “condition” of the snow, I respectfully dissent.
I am authorized to state that JUSTICE GABRIEL joins in this dissent.

[1] We granted certiorari to review the following issue:
Whether, for the purposes of the Ski Safety Act (“SSA”) of 1979, codified at sections C.R.S. 33-44-101 to -114 (2014), the term “inherent dangers and risks of skiing,” as defined in C.R.S. 33-44-103(3.5) (2014), encompasses avalanches that occur within the bounds of a ski resort, in areas open to skiers at the time in question.
[2] Because we find that the enumerated term “snow conditions as they exist or may change” encompasses in-bounds avalanches, we do not reach the question of whether the term “including” as used in section 33-44-103(3.5) is exclusive or non-exclusive.
[3] We have construed the term “injury” to include death. Stamp v. Vail Corp., 172 P.3d 437, 447 (Colo. 2007).
[4] Because we conclude that the phrase “snow conditions as they exist or may change” encompasses in-bounds avalanches, we need not consider Fleury’s additional argument, based on the dissent, that “a statute’s grant of immunity must be strictly construed.” Fleury, ¶ 38 (J. Jones, J., dissenting); see Ryals v. St. Mary-Corwin Reg’l Med. Ctr., 10 P.3d 654, 661 (Colo. 2000) (“A statute may modify or restrict a common law right only to the extent embraced by the statute.”).

[1] Section 33-44-103(3.5) reads, in its entirety:
“Inherent dangers and risks of skiing” means those dangers or conditions that are part of the sport of skiing, including changing weather conditions; snow conditions as they exist or may change, such as ice, hard pack, powder, packed powder, wind pack, corn, crust, slush, cut-up snow, and machine-made snow; surface or subsurface conditions such as bare spots, forest growth, rocks, stumps, streambeds, cliffs, extreme terrain, and trees, or other natural objects, and collisions with such natural objects; impact with lift towers, signs, posts, fences or enclosures, hydrants, water pipes, or other man-made structures and their components; variations in steepness or terrain, whether natural or as a result of slope design, snowmaking or grooming operations, including but not limited to roads, freestyle terrain, jumps, and catwalks or other terrain modifications; collisions with other skiers; and the failure of skiers to ski within their own abilities. The term “inherent dangers and risks of skiing” does not include the negligence of a ski area operator as set forth in section 33-44-104(2). Nothing in this section shall be construed to limit the liability of the ski area operator for injury caused by the use or operation of ski lifts.
(Emphases added.)
[2] The SSA does require ski area operators to print lift tickets containing a warning to skiers of the “inherent dangers and risks of skiing,” using language drawn from section 33-44-103(3.5). § 33-44-107(8)(c), C.R.S. (2015). Interestingly, this required lift ticket warning notifies skiers that they assume the risk of injury from a host of hazards, specifically: “[c]hanging weather conditions; existing and changing snow conditions; bare spots; rocks; stumps; trees; collisions with natural objects, man-made objects, or other skiers; variations in terrain; and the failure of skiers to ski within their own abilities.” Id. Like subsection (3.5), nowhere in this required warning does the term “avalanche” appear. And for the reasons stated above, I gravely doubt a skier would infer from this list that “avalanches” naturally fall under the category of "changing snow conditions."
[3] In 1996, a ski patroller threw an avalanche charge from a chairlift at Loveland Ski Area in Colorado and triggered a “massive” avalanche that uprooted trees and destroyed the patroller’s own 1986 Honda Civic, parked in a lot at the base of the mountain. See John Meyer, Loveland’s Over the Rainbow was cleared by a human-set avalanche, The Denver Post, Oct. 15, 2012, http://perma.cc/C9T4-6A28.
[4] I note that other states’ versions of the SSA expressly allocate avalanche liability between ski area operators and skiers. A previous version of Montana’s statute defined “inherent dangers and risks of skiing” as including “avalanches, except on open, designated ski trails.” Mont. Code Ann. § 23-2-702(2)(c) (2013). This section was amended in 2015 to provide that avalanches do not qualify as inherent dangers “on open, machine-groomed ski trails.” See 2015 Mont. Laws 299 (emphasis added). Alaska requires ski area operators to prepare and implement a plan of operation each ski season that includes provisions for avalanche control and rescue, Alaska Stat. § 05.45.040 (2015), and a ski area operator that violates this provision is negligent and may be held civilly liable, id. at § 05.45.020.