FILED
United States Court of Appeals
Tenth Circuit

February 12, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JAMES NELSON; ELIZABETH
VARNEY,

      Plaintiffs - Appellees,

v.

UNITED STATES OF AMERICA,

      Defendant - Appellant.

No. 17-1388

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:11-CV-02953-WYD-CBS)**
_____

Joshua M. Salzman, Appellate Staff Attorney, Civil Division (Chad A. Readler, Acting
Assistant Attorney General; Bob Troyer, United States Attorney; and Mark B. Stern,
Appellate Staff Attorney, Civil Division, with him on the briefs), United States
Department of Justice, Washington, D.C., for Defendant – Appellant.

Robert T. Fishman, Ridley, McGreevy & Winocur, PC, Denver, Colorado (David P.
Hersh, Steven G. Greenlee, Burg Simpson Eldredge Hersh & Jardine, PC., Englewood,
Colorado, with him on the brief), for Plaintiffs – Appellees.
_____

Before **MATHESON**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

In 2008, Mr. James Nelson was seriously injured while riding his bicycle on United States Air Force Academy land. He and his wife, Elizabeth Varney,[1] sued the Academy under the Federal Tort Claims Act ("FTCA"), seeking damages. The district court ruled in their favor and awarded them approximately $7 million in damages. In a previous appeal, we reversed that decision, holding that the Colorado Recreational Use Statute (the "CRUS") shielded the Academy from liability. But we remanded on the issue of whether an exception to the statute's liability shield applied. On remand, the district court held that an exception did apply and reinstated its prior judgment. The Academy then brought this appeal.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

On September 3, 2008, Mr. Nelson was involved in a bicycle accident while riding on an asphalt path on Academy land. *Nelson v. United States* ("*Nelson III*"), 256 F. Supp. 3d 1136, 1141 (D. Colo. 2017). He struck a sinkhole, "lost control of his bicycle," and "was flung onto the asphalt path," suffering severe injuries. *Id.* The asphalt path ran parallel to Interstate 25 and was within an easement held by the Colorado Department of Transportation ("CDOT"), though CDOT was not responsible for maintaining the path. *See id.* at 1141–42. At both entrances to the path were two signs—one that read, "Bicycle Path, No Motorized Vehicles," and another, less visible, that prohibited entry onto Academy property. *See id.* at 1145;

_____

[1] For ease of reference, we refer to Mr. Nelson and Ms. Varney collectively as the Nelsons.

2

*Nelson v. United States* ("*Nelson II*"), 827 F.3d 927, 929 (10th Cir. 2016). The

Academy did not post the bicycle-path signs, nor did it otherwise designate the path

as a recreational trail. *Nelson III*, 256 F. Supp. 3d at 1144–45. In fact, the Academy

considered public users to be trespassers. *Id.* Yet, despite knowing the public used the

path, the Academy did not take any affirmative steps to preclude the public or

remove the bicycle-path signs prior to Mr. Nelson's accident. *See id.*

The sinkhole that Mr. Nelson encountered "encompassed the entire width of

the path" and was created by "wash-out/erosion problems in the area." *Id.* at 1143.

Despite its size, the sinkhole was difficult to see by users of the path. *See id.* The

sinkhole was first discovered on August 20, 2008, by Dr. Brian Mihlbachler, a

biologist with the Fish and Wildlife Service. *Id.* at 1145–46. Dr. Mihlbachler "had

[the] responsibility for managing the natural resources on the Academy's" land,

particularly monitoring "serious erosion and sedimentation issues" and "reporting to

the appropriate party if issues were identified." *Id.* at 1146. Dr. Mihlbachler was an

employee of the Academy and "had responsibilities related to Academy safety and

security and reporting safety concerns." *Id.* at 1147. He found the sinkhole while

monitoring erosion "along [the Academy's] boundary." *Id.* at 1146. Dr. Mihlbachler

photographed and documented the sinkhole but "did not report the sinkhole or show

the photographs to anyone." Consequently, he was the only Academy employee who

was actually aware of the sinkhole before Mr. Nelson's accident. *Id.* at 1146–47.

Despite knowing the path was being used at least occasionally "for recreational

3

purposes," *id.* at 1144, 1161, Dr. Mihlbachler did not take any steps to warn of, fill in, or cordon off the sinkhole prior to the accident, *id.* at 1147–49.

Mr. Nelson and his wife filed suit against the Academy in district court, seeking damages under the FTCA. *Id.* at 1140. The district court found that Mr. Nelson was an invitee or licensee and that the Academy was liable for his injuries. *Id.* The district court awarded him approximately $7 million for his injuries and losses and awarded Ms. Varney $401,425 for loss of consortium. *Id.* The Academy had argued the CRUS shielded it from liability, but the district court held the CRUS was inapplicable. *See id.* The Academy appealed, and we reversed the district court, concluding the CRUS did apply. *Nelson II*, 827 F.3d at 929. But we did not reach the question of whether an exception to the CRUS applied. Instead, we remanded to the district court to make that determination in the first instance. *Id.* at 933. On remand, the district court held that "the Academy and Dr. Mihlbachler" were not shielded from liability under the CRUS because, per an exception to the CRUS relevant here ("the CRUS exception"), they "willfully ignored the dangerous condition on the path and chose not to take steps to warn or guard users like Mr. Nelson against that danger." *Nelson III*, 256 F. Supp. 3d at 1165; *see also* Colo. Rev. Stat § 33-41-104(1). The district court also held alternatively that even if the Academy's and Dr. Mihlbachler's actions were not considered collectively, "Dr. Mihlbachler acted willfully" and thus the Academy was liable. *See id.* The Academy brought this appeal.

We agree with the district court that Dr. Mihlbachler's actions and knowledge alone are sufficient to support a finding of liability against the Academy.[2]

## II. DISCUSSION

In reviewing the district court's conclusion that Mr. Nelson's claim falls within the CRUS exception, we first provide an overview of that exception under Colorado law. Then, we review the district court's decisions in some detail to assess whether the court's conclusion is correct according to Colorado law, and whether it is supported by the district court's factual findings. Ultimately, we determine that judgment in favor of the Nelsons is proper, and we affirm the decision of the district court.

### A. The CRUS and the CRUS Exception

The Colorado General Assembly adopted the CRUS "to encourage owners of land to make land and water areas available for recreational purposes." Colo. Rev. Stat. § 33-41-101. It attempts to accomplish this goal "by limiting [landowner] liability toward persons entering thereon for [recreational] purposes." *Id.* Accordingly, the CRUS provides a near complete liability shield to landowners "who directly or indirectly invite[] or permit[], without charge, any person to use [their] property for recreational purposes." *Id.* § 33-41-103(1). But this broad liability shield is only nearly complete. Relevant here, the CRUS exception states that "[n]othing in

---

[2] Because we believe Dr. Mihlbachler's conduct and knowledge on their own provide a basis for affirming the district court, we do not reach the question whether the Academy is liable via the collective imputation of Dr. Mihlbachler's and other Academy employees' knowledge.

[the CRUS] limits in any way any liability which would otherwise exist . . . [f]or willful or malicious failure to guard or warn against a known dangerous condition, use, structure, or activity likely to cause harm." *Id.* § 33-41-104(1).

The core legal issue in this case is a question of state law—the proper interpretation of the CRUS exception. "In FTCA cases, we review the district court's determination of state tort law de novo." *Nelson II*, 827 F.3d at 930. "When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule." *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002). When interpreting a statute, Colorado courts "first look to the statutory language and give words and phrases their plain and ordinary meaning." *Climax Molybdenum Co. v. Walter*, 812 P.2d 1168, 1173 (Colo. 1991). They also examine "the statute as a whole and strive to give 'consistent, harmonious, and sensible effect to all parts.'" *Reno v. Marks*, 349 P.3d 248, 253 (Colo. 2015) (quoting *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1088–89 (Colo. 2011)). If a statute grants immunity in derogation of the common law, Colorado courts construe the grant of immunity narrowly and exceptions to that grant broadly. *See Burnett v. State Dep't of Nat. Res.*, 346 P.3d 1005, 1008 (Colo. 2015). But throughout the statutory construction inquiry, the "touchstone remains the intent of the legislature." *St. Vrain Valley Sch. Dist. RE-1J v. A.R.L. ex rel. Loveland*, 325 P.3d 1014, 1019 (Colo. 2014).

We agree with the district court that "Colorado appellate courts," including the Colorado Supreme Court, "have not specifically construed" the CRUS exception. *See*

6

*Nelson III*, 256 F. Supp. 3d at 1149. Thus, we have the responsibility to predict how the Colorado Supreme Court would interpret it in the first instance. *See Johnson*, 305 F.3d at 1118. Before considering the text of the statute, however, we must determine whether the CRUS derogates the common law such that we are required to construe the CRUS's liability shield narrowly and the CRUS exception broadly. *See Burnett*, 346 P.3d at 1008. The Academy argues this doctrine is inapplicable here because the CRUS "does not displace the common law, but rather the Colorado Premises Liability Act [("CPLA")]." Appellant's Br. at 23–24. The CPLA sets out the circumstances under which landowners may be liable to entrants on their property, *see* Colo. Rev. Stat. § 13-21-115(2)–(5), and aspects of it represent "substantial departure[s] from the common law," *see Larrieu v. Best Buy Stores, L.P.*, 303 P.3d 558, 565 & n.9 (Colo. 2013); Colo. Rev. Stat. § 13-21-115(1.5)(e) (explaining that the purpose of the CPLA is, among other things, "to protect landowners from liability in some circumstances when they were not protected at common law"). The Academy suggests that because the CPLA displaced the common law, any further changes to landowner liability displace only the CPLA. This, is at least in part because the CPLA "was designed to enhance protections for landowners." *See* Appellant's Br. at 23–24 (citing Colo. Rev. Stat. § 13-21-115(1.5)(e)). We are not convinced.

The Academy's argument suffers from at least two flaws. First, it assumes without authority that multiple statutes cannot, either working in tandem or separately, derogate the same general area of common law. Second, it overlooks that the CPLA and the CRUS have consonant purposes. The CRUS was passed to

7

"encourage owners of land to make land and water areas available for recreational purposes by limiting their liability toward persons entering thereon for such purposes." Colo. Rev. Stat. § 13-41-101. And, as the Academy notes, the purpose of the CPLA is "to create a legal climate which will promote private property rights and commercial enterprise and will foster the availability and affordability of insurance" by "protect[ing] landowners from liability in some circumstances when they were not protected at common law." *Id.* § 13-21-115(1.5)(d)–(e). In short, the CRUS did not displace the CPLA but furthered its purpose. So the CRUS, either on its own or working in tandem with the CPLA, derogates the common law. Thus, its liability shield must be construed narrowly and the CRUS exception must be construed broadly.

We now move to the text of the statute. The parties do not dispute most of the district court's construction of the CRUS exception—neither party claims that the term "malicious" applies here nor that we are considering a dangerous "use, structure, or activity." *See* Colo. Rev. Stat. § 33-41-104(1)(a). The CRUS exception's remaining relevant text indicates that a landowner is liable for injuries on its land that result from a "willful . . . failure to guard or warn against a known dangerous condition . . . likely to cause harm." *See id.* The Academy also has not disputed the district court's findings that the sinkhole was a dangerous condition likely to cause harm, *see Nelson III*, 256 F. Supp. 3d at 1150–52, that Dr. Mihlbachler knew the path was being used for recreational purposes, *id.* at 1144, 1161, that Dr. Mihlbachler failed to warn or guard against the dangers inherent in the sinkhole on a known bike

8

path, *id.* at 1147–49, 1162–65, or that Dr. Mihlbachler knew about the sinkhole prior to Mr. Nelson's accident, *id.* at 1146–47; *see also* Appellant's Reply Br. at 13 (explaining that the Academy is not "challeng[ing] the district court's findings" of fact).

This leaves us with two disputes: whether Dr. Mihlbachler knew the sinkhole was a "dangerous condition likely to cause harm" and whether his failure to warn or guard against that dangerous condition was "willful." Before addressing those issues, we define the terms "known" and willful" under Colorado law. We then proceed to apply that law to the facts found by the district court.

**1. Knowledge Under Colorado Law**

For a landowner to be found liable despite the CRUS's liability shield, it (or its agent) must willfully fail to warn or guard against a "*known* dangerous condition . . . likely to cause harm." *See* Colo. Rev. Stat. § 33-41-104(1)(a) (emphasis added). The Colorado Supreme Court recently explained that "[s]tatutory interpretation in Colorado has consistently construed the words 'know' or 'knowingly' without [a] qualifying 'should have known' to require actual knowledge." *Przekurat ex rel. Przekurat v. Torres*, 428 P.3d 512, 516, *reh'g denied* (2018).[3] The court defined

---

[3] The Colorado Supreme Court issued *Przekurat ex rel. Przekurat v. Torres*, 428 P.3d 512, 516, *reh'g denied* (2018), after the briefing in this court, but before oral argument. Neither party alerted us to the decision at oral argument or by a letter under Federal Rule of Appellate Procedure 28(j).

actual knowledge as "one's awareness of objective facts."[4] *Id.* at 517. In *Przekurat*, the court was interpreting an exception to the Colorado Dram Shop Act's liability shield for "social hosts." *Id.* at 514–15. That exception reinstates potential liability for a social host who "knowingly provide[s] the person under the age of twenty-one a place to consume an alcoholic beverage." *Id.* at 515 (quoting Colo. Rev. Stat. § 12-47-801(4)(a) (2017)). The court concluded that the "knowing" "mens rea" applied to "both the provision of the space for alcohol consumption and the age of the specific underage drinker." *Id.* at 515.

Because we believe *Przekurat* is indicative of how the Colorado Supreme Court would resolve this case, we apply it analogously. As in *Przekurat*, the knowledge element of the CRUS exception is not qualified by "reason to know" and thus requires actual knowledge. Further, that knowledge element applies to both the existence of the dangerous condition and the likelihood that it will cause harm. Accordingly, the Academy may be liable only if Dr. Mihlbachler actually knew of the existence of the sinkhole that caused Mr. Nelson's injuries and that the sinkhole was likely to cause harm.

**2. Willfulness Under Colorado Law**

We next consider the proper interpretation of "willful" under Colorado law. The district court defined willful conduct as conduct taken "voluntarily, purposefully

---

[4] The Colorado Supreme Court has defined "objective facts" as those facts "that can be proven as false." *See, e.g.*, *In re Green*, 11 P.3d 1078, 1084 (Colo. 2000).

and with a conscious disregard for the consequences of the [conduct]." *Nelson III*, 256 F. Supp. 3d at 1159 (quoting *Hohn v. Morrison*, 870 P.2d 513, 517 (Colo. App. 1993)). In support, the district court cited *Pettingell v. Moede*, 271 P.2d 1038, 1042 (Colo. 1954) (defining "[w]illful action" as "voluntary; by choice; intentional; purposeful") and *Hohn*, 870 P.2d at 517 (relying on *Black's Law Dictionary* to conclude that willful conduct means conduct done "voluntarily, purposefully, and with a conscious disregard for the consequences of his or her conduct" and with "no justifiable excuse") (emphasis omitted)) *See Nelson III*, 256 F. Supp. 3d at 1159. But "willfulness does not," the district court concluded, "require that a government employee be consciously aware that his acts or omissions create danger or risk to the safety of others." *Id.* at 1159–60.

The Academy takes issue with the district court's second statement that a government employee need not be conscious of the consequences of his actions, claiming that "conduct is 'willful' only if the landowner or its agent consciously exposed others to a substantial risk of injury." Appellant's Br. at 14. If "willful" includes a risk-of-harm component here, however, it introduces surplusage because the statute already explicitly includes such language. Under Colorado law, "[w]e must give effect to the meaning, as well as every word[,] of a statute if possible." *Bennett Bear Creek Farm Water & Sanitation Dist. v. City & Cty. of Denver ex rel. Bd. of Water Comm'rs*, 928 P.2d 1254, 1262 (Colo. 1996); *see also In re Marriage of Rooks*, 429 P.3d 579, 599 (Colo. 2018) (declining to interpret one provision of a statute in such a way as would render another provision of the statute "mere

11

surplusage") (quoting *Colo. Med. Bd. v. Office of Admin. Courts*, 333 P.3d 70, 74 (Colo. 2014); *People v. Flenniken*, 749 P.2d 395, 399 (Colo. 1988) (same); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) (explaining that no word or provision "should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence"). The Academy cites three Colorado Supreme Court cases in support of its position that "willful" conduct requires that the landowner consciously expose others to a substantial risk of injury, but each is readily distinguishable. *See* Appellant's Br. at 17–18 (discussing *Crum v. Groce*, 556 P.2d 1223, 1224 (Colo. 1976) (interpreting a statute that does not include risk-of-harm language); *United Blood Servs., a Div. of Blood Sys., Inc. v. Quintana*, 827 P.2d 509, 523 n.10 (Colo. 1992) (same); *People v. Marcy*, 628 P.2d 69, 78 (Colo. 1981) (interpreting a criminal statute that provides its own definition of "willful")).

In *Przekurat*, the Colorado Supreme Court provides more analogous guidance. There, contrasting "knowingly" with "willfully," the court defined "willfully" as "one's subjective intent to act on—or in spite of—[one's] awareness" of objective facts. 428 P.3d at 517. This more recent definition of "willful" under Colorado law supports the definition provided in *Hohn*—"voluntarily, purposefully, and with a conscious disregard for the consequences of his or her conduct" and with "no justifiable excuse." 870 P.2d at 517–18 (emphasis omitted). Thus, the Academy is liable for Mr. Nelson's injuries if Dr. Mihlbachler purposefully or voluntarily failed to warn or guard with conscious disregard for the consequences of that failure. That

12

is, if he had the subjective intent to fail to act despite actually knowing that there was a sinkhole and it was likely to cause harm.

Having defined the terms used in the CRUS exception, we now consider whether the district court's conclusion that the Nelsons' claim falls within that exception is correct and supported by the district court's findings.

### B. The District Court's Findings and Conclusions

The factual findings relevant to this analysis can be found in the district court's initial decision granting relief on the grounds the CRUS did not apply, *Nelson v. United States* ("*Nelson I*"), 20 F. Supp. 3d 1108, 1114 (D. Colo. 2014), *rev'd and remanded*, *Nelson II*, 827 F.3d 927, and in its decision after remand holding the claim falls within the CRUS exception, *Nelson III*, 256 F. Supp. 3d at 1136. After considering evidence described in *Nelson I* and *Nelson III*, the district court in *Nelson III* found facts relevant to the two disputes in this appeal. It found that: (1) Dr. Mihlbachler knew the sinkhole was a dangerous condition and (2) he acted willfully in failing to guard or warn against it.

The Academy argues that the district court's findings of fact in *Nelson I* and in *Nelson III* cannot be squared with its ultimate conclusion in *Nelson III* that Dr. Mihlbachler willfully failed to warn of or guard against the known dangerous condition. In particular, the Academy argues, "The district court's initial opinion contained no suggestion that the Academy's conduct was anything more than negligent[] and contained no hint that the conduct might be malicious or willful." *Id.* at 2, 9. And the Academy contends the district court's "finding that the 'thought never

13

occurred' to Dr. Mihlbachler that the damage to the path would create a safety hazard" precluded it from holding in favor of the Nelsons. Appellant's Br. at 31. These arguments sound like arguments about facts, but as noted above, the Academy does not dispute any of the district court's factual findings. Accordingly, the Academy's arguments about contrary evidence are arguments that the district court made legal errors. The district court's knowledge finding would be legal error if the court relied on constructive rather than actual knowledge.[5] Similarly, its willfulness finding would be legal error if the court relied on an impermissible definition of willfulness. In both instances, we conclude the district court did not commit legal error. To illustrate why, we first examine the district court's opinion in *Nelson I*. We then review the opinion in *Nelson III*, focusing on the district court's findings of fact and conclusions of law related to Dr. Mihlbachler.

---

[5] Conceivably, the district court could also commit legal error if its conclusion is not supported by the findings of fact. *See United States v. Vega*, 141 F.3d 1186 (Table), 1998 WL 110433, at *2 (10th Cir. 1998) (describing such a challenge as raising a mixed question that we would review, in this context, de novo); *State Distribs., Inc. v. Glenmore Distilleries Co.*, 738 F.2d 405, 412 & n.2 (10th Cir. 1984) (explaining "it is fundamental that a judgment cannot be sustained on appeal unless the conclusion upon which it rests has support in one or more findings of fact" and applying "the more stringent standard of review accorded conclusions of law"). Because our conclusion that the findings of fact support the district court's conclusion that Dr. Mihlbachler, and thus the Academy, had actual knowledge of the dangerous condition, we need not separately consider this interpretation of the Academy's argument.

1. *Nelson I*

Appellants argue that: (1) *Nelson I* impermissibly conflicts with *Nelson III* and (2) *Nelson III* incorporates findings in *Nelson I* that are incompatible with the district court's conclusion in *Nelson III*. We explain why the first argument fails and then explain the factual findings in *Nelson I* before considering *Nelson III*.

First, while it is true *Nelson I* did not find willful or malicious conduct, that question was not relevant to whether the Academy had directly or indirectly opened the path for recreational use.[6] On remand, the willfulness of the Academy's conduct became the central issue, and the district court's focus shifted accordingly. The court made new findings of fact sufficient to support its conclusion that the CRUS exception is implicated. The district court was permitted to do this. *See Hicks v. Gates Rubber Co.,* 928 F.2d 966, 971 (10th Cir. 1991) (holding that when proceeding on a general remand, the district court is free to decide any issues not foreclosed by the appellate mandate); *Otero v. Mesa Cty. Sch. Dist. No. 51,* 628 F.2d 1271, 1272 (10th Cir. 1980) (holding that the district court did not err by making additional findings on remand without taking new evidence).[7]

---

[6] The Academy also finds it significant that the district court "never suggested that plaintiffs could prevail under the standard applicable under the [CRUS] or the standard applicable in cases involving trespassers." Appellant's Br. at 8 & n.3. But as the district court concluded there that the CRUS did not apply and that Mr. Nelson was an invitee or licensee, this is not surprising.

[7] *See also* V. G. Lewter, *Power of Trial Court, on Remand for Further Proceedings, to Change Prior Fact Findings as to Matter Not Passed Upon by the Appellate Court, Without Receiving Further Evidence*, 19 A.L.R.3d 502 (1968) ("If the lower court then [on remand] perceives an error in its own former proceedings,

15

Second, we recount the district court's findings in *Nelson I*. Relevant to our inquiry, are the undisputed findings that: "Dr Mihlbachler did not believe the path was an official recreation trail, or that outside users were invited or permitted to use the path for recreation," 20 F. Supp. 3d at 1117, and "Dr. Mihlbachler did not believe there was an urgent need to have the path repaired because it was on the CDOT and MVEA [Mountain View Electric Association] easement and was present for their use," *id.* The court then sets forth "Findings of Additional Fact," based on the evidence at trial. Of relevance, those findings state: "Dr. Mihlbachler knew of the existence and condition of the path." *Id.* at 1122. "Dr. Mihlbachler had seen five or six people use the path for walking, jogging, and biking prior to September 3, 2008. He saw most of these people before 2005, when the Struthers Road was built. The construction of Struthers Road in 2005 provided an alternate route [through the area] so that people did not need to use the asphalt path." *Id.* "Dr. Mihlbachler *testified that* the condition of the asphalt path with the sinkhole which he observed before Mr. Nelson's accident would be a safety hazard for users of the path if it were an official [Academy] trail. Thus, if it were an official trail, he would have reported the condition of the path to maintenance to get it repaired." *Id.* (emphasis added). "He also *testified that* he did not think the path was being used by pedestrians or bikers.

such as inconsistent findings of fact and the like, not touched upon by the appellate court, there would appear to be no reason why it could not change its former findings to any extent not prohibited by the appellate court mandate, even if the change in findings would result in the application of a different legal principle and a corresponding change in the ultimate holding.").

Thus, the thought never occurred to him that the damage to the path would create a safety hazard." *Id.* at 1122–23 (emphasis added). "Dr. Mihlbachler's decision not to do anything about the sinkhole on the path or report it to anyone was based on his perception that it was on the CDOT and MVEA easement for their use and was not the responsibility of the Academy. It also was based on the fact that he did not think people were using the path for recreational purposes." *Id.* at 1123.

On appeal, we reversed the district court's determination that the CRUS was inapplicable, concluding instead that the Academy had indirectly made the asphalt path available for recreational use. *Nelson II*, 827 F.3d at 929. But we remanded for the district court to consider in the first instance whether the claim fell within the CRUS exception. *Id.* at 933.

### 2. *Nelson III*

On remand, the district court "reviewed the entirety of the record and evidence, counsel's arguments, the parties' proposed findings of fact and conclusions of law, [its] previous Findings of Fact and Conclusions of Law, and Orders, and the Tenth Circuit Order." *Nelson III*, 256 F. Supp. at 1141. That review was focused on the sole issue on remand—the CRUS exception—and the court made additional findings of fact about each element of the CRUS exception. We consider the court's findings about the two elements at issue here: (1) knowledge and (2) willfulness. We conclude that the findings evince no legal error.

17

a.    *Knowledge*

The district court ended its consideration of "[w]hether the United States [k]new of the [p]ath and the [d]angerous [c]ondition," *id.* at 1152, by saying, "[T]he United States, including its representative Dr. Mihlbachler, knew that the path existed, knew significant erosion problems existed in that area, and specifically knew on August 20, 2008, two weeks before Mr. Nelson was injured, of the existence of the dangerous condition on the path caused by erosion," *id.* at 1155. We conclude the district court's factual finding is consistent with the CRUS exception's requirement of actual knowledge.

Before finding Dr. Mihlbachler knew of the dangerous condition, the district court recited contrary evidence. To begin, the court repeated many of the factual findings from *Nelson I*. *Id.* at 1144. It then proceeded to catalog the relevant evidence, even when it appeared internally inconsistent. For example, the district court noted that Dr. Mihlbachler "*testified that* to his understanding there was no rule or regulation in the trail management plan or otherwise that would have required fixing a hole on an unofficial path such as the asphalt path" and that "the Academy's trail management plan contains guidelines about what constitutes a safe trail for the users, and that 'criteria would have applied in this situation [to the asphalt path] had [he] known that it was designed . . . as a trail." *Id.* at 1147 (emphasis added). The district court also noted that "Dr. Mihlbachler chose not to do anything about the sinkhole . . . based on his perception that it was on the CDOT and MVEA easement for their use and was not the Academy's responsibility," *id.*, and "the fact that he did

not think people were using the path for recreational purposes," *id.* at 1148. As in *Nelson I*, the district court summarized Dr. Mihlbachler's testimony: "As he did not think the path was being used by pedestrians or bikers, the thought never occurred to Dr. Mihlbachler that the damage to the path would create a safety hazard. He did not think that the hole was likely to cause anyone harm." *Id.* at 1148.

But *Nelson III* also referred to evidence that supported the district court's ultimate finding on knowledge, reiterating the *Nelson I* finding that Dr. Mihlbachler "saw members of the public use the path on five or six occasions," and although "most" of those occasions were "before 2005," some occurred after the installation of the new Struthers Road in 2005. *Id.* Thus, the evidence and testimony expressed in the "Findings of Fact" section are in tension and appear to be best understood as a compilation of the relevant testimony.

It is the district court's "Conclusions of Law" that resolve this apparent conflict. The district court sifts through Dr. Mihlbachler's testimony and provides the court's reasons for discounting some of it. To illustrate, the conclusions state, "Dr. Mihlbachler *testified that* the condition of the asphalt path with the sinkhole, which he observed before Mr. Nelson's accident, would be a safety hazard for users of the path—if it were an official Academy trail." *Id.* at 1151 (emphasis added). The district court then rejects this testimony, explaining: "The fact that the path was not an official Academy trail, however, does not make it any less of a dangerous condition to the people using it for recreational purposes. Indeed, the evidence established that the condition of the asphalt path with a sinkhole did not meet Academy safety

19

standards." *Id.* Thus, while the district court's findings accurately relate Dr. Mihlbachler's testimony regarding his motives and beliefs, the inclusion of those statements cannot be read, as the Academy insists, as the district court's imprimatur of their veracity.

Instead, the district court found Dr. Mihlbachler knew the sinkhole was a dangerous condition by considering circumstantial evidence of his knowledge. Colorado law permits this manner of proving knowledge. *See Christoph v. Colo. Commc'ns Corp.*, 946 P.2d 519, 523 (Colo. App. 1997) ("[K]nowledge . . . may be proved either by direct evidence of actual knowledge, or by circumstantial evidence."). Dr. Mihlbachler saw and photographed a sinkhole the parties agreed was dangerous. He knew people used the path for recreation. And a large and difficult-to-see sinkhole on a paved path is dangerous even if few people travel the path. *See Termini v. United States*, 963 F.2d 1264, 1269 (9th Cir. 1992) ("That only two vehicles per day typically use the spur [road] seems to us much less important than the fact that it abruptly terminates at a cliff."). In other words, the danger was obvious enough to support the district court's inference—sufficient to overcome Dr. Mihlbachler's testimony about lack of a hazard—that he actually knew the sinkhole was dangerous and likely to cause harm.

To be sure, the district court could have more precisely separated its actual findings of fact from its recitation of the evidence and from its legal conclusions. But we are not bound by the label attached by the district court. *See, e.g., Hjelle v. Mid-State Consultants, Inc,* 394 F.3d 873, 879 (10th Cir. 2005) (noting that the district

20

court's labels are "irrelevant for purposes of appeal"); *Feartherstone v. Barash,* 345 F.2d 246, 250 (10th Cir. 1965) (noting that the requirement with regard to findings of fact and conclusions of law "are far from rigid and unworkable, or unadaptable to practical court administration"); *Houck v. Hinds,* 215 F.2d 673, 676 (10th Cir. 1954) (holding that the appellate court is not bound by the designation or finding or conclusion attached by the district court). Here, the *Nelson III* opinion relates the evidence in its findings of fact, including portions of the testimony that are in conflict, and then resolves that tension in its conclusions of law. Where we are able to understand the basis for the district court's decision, we will not hold it to a "rigid and inflexible" standard. *See Feartherstone,* 345 F.2d at 250.

      b.    *Willfulness*

After concluding that Dr. Mihlbachler, and therefore the Academy, knew of the dangerous condition, *Nelson III,* 256 F. Supp. at 1155, the district court turned to the question of whether the failure to guard or warn was "willful." It concluded that despite any statements to the contrary, "Dr. Mihlbachler also knew, prior to September 2008, that people had used the path for recreational purposes."[8] *Id.* at 1161. The district court then provided a detailed three-part analysis of its conclusions regarding the Academy's willful failure to guard or warn.

---

[8] This finding is contrary to the Academy's position that "[t]he court did not find that any of the employees who were aware of the path's use were also aware of the sinkhole." Appellant's Br. at 10.

21

First, noting that "[t]he Academy's knowledge and failure to act regarding the path must be considered in conjunction with Dr. Mihlbachler's actions or failures to act," the district court reiterated Dr. Mihlbachler's responsibility for investigating the substantial erosion problems and his discovery of the dangerous condition caused by the sinkhole. *Id.* at 1162.

Second, the court reaffirmed that "Dr. Mihlbachler and the Academy did nothing . . . to warn the public of the sinkhole/washout or to guard against the danger of erosion that caused the sinkhole." *Id.* In doing so, the district court expressly rejected Dr. Mihlbachler's purported rationale for failing to act:

> Dr. Mihlbachler acknowledged that if the path had been an official Academy trail, the condition of the asphalt path that he observed would be a safety hazard for users of the path and he would have reported the condition of the path immediately to maintenance to get it repaired. *The fact that the Academy had not officially designated it as an official trail does not, however, make it less dangerous to the public. Similarly. the fact that Dr. Mihlbachler thought the trail was to be maintained by CDOT and MVEA does not make it any less dangerous*. . . . Yet, Dr. Mihlbachler consciously chose not to do anything or tell anyone about the sinkhole because he felt it was not a high priority relative to all the other erosion issues that he was dealing with along the eastern boundary.

*Id.* at 1163 (emphasis added).

Third, after explaining its reasons for finding Dr. Mihlbachler's contrary assertions implausible, the district court concluded: "Dr. Mihlbachler acted 'voluntarily, intentionally, and with a conscious disregard for the consequences of the act' when he chose not to make the sinkhole a priority or to do anything to warn about it or guard against its danger." *Id.* That is, the court concluded that Dr. Mihlbachler acted willfully.

22

The district court rejected the Academy's argument that Dr. Mihlbachler "did not actually 'know' that the sinkhole posed a danger . . . as he did not believe anyone was still using the path for recreational purposes . . . ." *Id.* Again noting that Dr. Mihlbachler had seen people using the path for recreational purposes, the court stressed that "there is no evidence that he thought something had been done to subsequently preclude its use." *Id.* at 1164. Considering all the objective facts known to Dr. Mihlbachler, the district court also concluded that "a reasonable person would believe the sinkhole would be dangerous to anyone using the path for recreational purposes, and specifically, bicycling—where a person may not be able to see the sinkhole in time to stop." *Id.*

The Academy takes issue with this conclusion, claiming it reflects the improper use of a constructive knowledge standard: "The district court determined that it was sufficient to establish liability that a reasonable person in Dr. Mihlbachler's position would have appreciated that a recreational user might eventually use the path and that the sinkhole would create a dangerous condition for such a user." Appellant's Br. at 32. This misconstrues the district court's analysis. First, the district court found that Dr. Mihlbachler was actually aware of recreational use. *Nelson III*, 256 F. Supp. at 1161. Second, the district court considered the reasonableness of Dr. Mihlbachler's ignorance as one factor relevant to its analysis of whether Dr. Mihlbachler's testimony is believable and thus, whether he in fact had actual knowledge.

Indeed, *Nelson III* continues by noting further concerns about Dr. Mihlbachler's veracity: "Dr. Mihlbachler's testimony that he did not do anything about the sinkhole based on his perception that it was on the CDOT and MVEA easement and was not the responsibility of the Academy is inconsistent with his testimony that he took no action because it was not a high priority relative to all the other erosion issues that he was dealing with," his understanding that he had the discretion to fix the path, and "his testimony that if he had been aware of the 'Bicycle Path' sign on the path or that it was a recreational trail that was getting used, he would have either removed the path because it did not fit with the official Trails Management Plan" or taken "the proper action to prevent a safety hazard." *Id.* at 1164–65. The court also found suspect Dr. Mihlbachler's claim that he "thought the path belonged to MVEA or CDOT," yet "didn't see any urgency to have the hole repaired by them *or by the Air Force Academy*." *Id.* at 1164. The clear import of the district court's decision is that it did not believe Dr. Mihlbachler: "Dr. Mihlbachler's testimony that he took no action in regard to the sinkhole because he thought it was CDOT's and/or MVEA's responsibility is . . . not credible." *Id.* at 1165. And those concerns were pervasive. The district court concluded, "Dr. Mihlbachler knew that he, as the Academy agent, could take action to fix the sinkhole or make it safe, regardless of whether the sinkhole was on [the] CDOT or MVEA easement," and the court could also see "no reason" Dr. Mihlbachler could not have contacted CDOT or MVEA about the sinkhole. *Id.*

24

Based on its careful review of the evidence on remand, the district court concluded: "[T]he Academy and Dr. Mihlbachler, its agent, willfully ignored the dangerous condition on the path and chose not to take any steps to warn or guard users like Mr. Nelson against that danger." *Id.* And it further concluded that, even considering his actions in isolation, "Dr. Mihlbachler acted willfully in failing to warn or guard against a known dangerous condition likely to cause harm." *Id.*

The district court's conclusion is adequately supported by its findings and consistent with Colorado law. Thus, the CRUS exception applies. And because Dr. Mihlbachler's knowledge and conduct are properly imputed to the Academy as his employer, the Nelsons may recover against the Academy.

### C. Justifiable Excuse

The Academy's final argument is that Dr. Mihlbachler could not have failed to warn or guard willfully because his good-faith belief that CDOT was responsible for the maintenance of the path provided a justifiable excuse for inaction. Assuming, without deciding, that "willful" under Colorado law requires the absence of a justifiable excuse, we conclude that Dr. Mihlbachler did not have one. As discussed, the district court expressly found incredible Dr. Mihlbachler's testimony that he chose not to do anything about the sinkhole because he thought it was on the CDOT easement. *Id.* In addition, the Academy has cited to no authority—and has made only conclusory arguments—to support its claim that a landowner's good-faith belief that someone else is responsible for a dangerous condition on its land provides a

justifiable excuse for inaction. Neither the statutory requirements nor common sense favor the Academy's claim.

Under the CRUS, a landowner is liable where it actually knows of a dangerous condition likely to cause harm and purposefully fails to warn or guard against such danger despite that knowledge. *See* Colo. Rev. Stat. § 33-41-104(1)(a); *Przekurat*, 428 P.3d at 517. Nothing in the CRUS exempts such liability simply because another party is responsible for the dangerous condition; the duty to warn or guard against the danger remains in effect. A landowner who decides not to act in the face of a known danger because it believes someone else is responsible for the maintenance of its land does not fail to act any less purposefully than does the landowner who decided not to act because it did not consider the danger "a high priority." *See Nelson III*, 256 F. Supp. 3d at 1148.

Further, even if Dr. Mihlbachler were correct that CDOT, not the Academy, was obligated to repair the sinkhole, he did nothing to alert CDOT about the sinkhole. *Cf. Baughman v. Cosler*, 459 P.2d 294, 298 (Colo. 1969) (holding that a landlord who "fails to disclose to his lessee any condition . . . which involves unreasonable risk of physical harm to persons on the land, is subject to liability to the lessee and others . . . for physical harm caused by the condition" if, among other things, the landlord "has reason to expect that the lessee will not discover the condition or realize the risks" (quoting Restatement (Second) of Torts § 358 (Am. Law. Inst. 1965)); *see also Palmer v. Alltel N.Y., Inc.*, 643 N.Y.S.2d 792, 792 (1996) (holding that, despite property being subject to an easement, landowner has

26

"nondelegable duty" to third parties); *Hartman v. Walkertown Shopping Ctr., Inc.*, 439 S.E.2d 787, 791 (N.C. Ct. App. 1994) (holding that land owner had duty to warn of unsafe conditions in easement-controlled area).

Even assuming such a defense is available, the Academy has failed to provide a justifiable excuse for its willful failure to guard or warn against the likely harm posed by the sinkhole.

## III.   CONCLUSION

We AFFIRM the district court's decision.