Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
January 31, 2022

**2022 CO 5**

**No. 21SA286, *In re People v. Greer*—Right to Court-Appointed Counsel—Indigent Defendant—Indigency Determination—§ 21-1-103, C.R.S. (2021)—CJD 04-04—JDF 208—C.A.R. 21.**

The supreme court considers whether the defendant, who has no income or assets but whose parents pay for all of his household expenses and allow him to live in their home rent-free, qualifies as indigent and is thus entitled to court-appointed counsel. Chief Justice Directive ("CJD") 04-04, which addresses the determination of indigency for purposes of state-funded counsel in criminal cases, instructs courts to consider the gross income from all members of a defendant's household who contribute monetarily to the household. The supreme court concludes, however, that courts should take a more nuanced approach where, as here, members of the defendant's household contribute financially to the household but deny the defendant access to their income.

The supreme court draws guidance from CJD 04-04's roommates provision, which considers income from a defendant's roommates (even those who

contribute financially to the shared residence) only when the defendant has access to such income. The limitation in the roommates provision is a reflection of the core inquiry regarding the determination of indigency under Colorado's jurisprudence: Whether, on a practical basis, the defendant lacks the necessary funds to retain counsel.

Consistent with the roommates provision, the supreme court holds that income from members of a defendant's household who contribute monetarily to the household should be excluded from an indigency determination when such income is unavailable to the defendant. Any other interpretation would render CJD 04-04 internally inconsistent, not to mention at odds with Colorado's case law, and risk constitutional violations.

Because the defendant's parents' income is not available to the defendant, the county court erred in considering it in its indigency determination. Accordingly, the supreme court makes the rule absolute and remands for further proceedings consistent with this opinion.

# The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

## 2022 CO 5

**Supreme Court Case No. 21SA286**
*Original Proceeding Pursuant to C.A.R. 21*
Arapahoe County Court Case No. 21T3345
Honorable J. Jay Williford, Judge

**In Re
Plaintiff:**

The People of the State of Colorado,

v.

**Defendant:**

Nicholas Feyd Greer.

**Rule Made Absolute**
*en banc*
January 31, 2022

**Attorneys for Plaintiff:**
John Kellner, District Attorney, Eighteenth Judicial District
Ann B. Tomsic, Chief Deputy District Attorney
    *Centennial, Colorado*

**Attorneys for Defendant:**
Megan A. Ring, Public Defender
Elsa Archambault, Deputy Public Defender
    *Centennial, Colorado*

**Attorneys for Respondent Arapahoe County Court:**
Philip J. Weiser, Attorney General
Emily B. Buckley, Assistant Attorney General
*Denver, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT**, **JUSTICE GABRIEL**, **JUSTICE HART**, and **JUSTICE BERKENKOTTER** joined.
**JUSTICE HOOD**, joined by **JUSTICE MÁRQUEZ**, dissented.

JUSTICE SAMOUR delivered the Opinion of the Court.

¶1     Not only [our] precedents but also reason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth . . . . The right of [an accused] to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours.

*Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).

¶2     *Gideon*'s ageless words of wisdom are now ingrained in the fabric of our criminal justice system. But they ring hollow if we interpret our indigency guidelines so as to deny court-appointed counsel to an accused who, on a practical basis, lacks the necessary funds to retain an attorney. Thus, in interpreting such guidelines, we must be ever watchful to ensure that we uphold the all-important right of equal access to our courts.

¶3     A county court's interpretation of our indigency guidelines ultimately led to the docking of this case at our C.A.R. 21 pier. The county court ruled that the defendant is not entitled to state-funded legal representation because he is not indigent. In our view, the court, though well-intentioned, erred in rejecting the defendant's application for court-appointed counsel. Considering the defendant's complete financial situation, he lacks the means to hire an attorney.

¶4     We recognize that the defendant lives with his parents rent-free and that his parents pay for all of the household expenses. We further recognize that Chief

3

Justice Directive ("CJD") 04-04, which addresses the determination of indigency for purposes of state-funded counsel in criminal cases, instructs courts to consider the gross income from all members of a defendant's household who contribute monetarily to the household.[1] Relying on this instruction in CJD 04-04, the county court considered the defendant's parents' income in its indigency determination. We believe, however, that courts should take a more nuanced approach to determining indigency where, as here, members of the defendant's household contribute financially to the household but deny the defendant access to their income.

¶5    We draw guidance from CJD 04-04's roommates provision, which considers income from a defendant's roommates (even those who contribute financially to the shared residence) only when the defendant has access to such income. The limitation in the roommates provision is a reflection of our case law's core inquiry regarding the determination of indigency: Whether, on a practical basis, the defendant lacks the necessary funds to retain counsel. The instruction in CJD 04-04 addressing income from members of a defendant's household who

---

[1] For ease of reference, we use "gross income" and "income" interchangeably in this opinion because that distinction has no bearing on our resolution of the question we confront.

contribute financially to the household appears to assume that such income is always available to the defendant. Indeed, it would be illogical for CJD 04-04 to exclude income from a defendant's roommates (even those who contribute financially to the shared residence) when such income is unavailable to the defendant, while at the same time include income from a defendant's household members who contribute financially to the household despite such income being equally unavailable to the defendant.

¶6 We now hold that, consistent with the roommates provision, income from members of a defendant's household who contribute monetarily to the household should be excluded from an indigency determination when such income is unavailable to the defendant. Any other interpretation would render CJD 04-04 internally inconsistent, not to mention at odds with our jurisprudence, and risk constitutional violations.

¶7 Inasmuch as the defendant's parents' income is not available to the defendant, the county court incorrectly considered it in its indigency determination. That income is of no assistance in the defendant's quest to secure legal representation. He cannot touch that money, much less spend it to hire an attorney. And when his parents' income is excluded from the indigency determination, it becomes readily apparent that the defendant's current financial status does not afford him equal access to the legal process.

¶8 Because the county court took into account the defendant's parents' income in rejecting his application for court-appointed counsel, we make the rule absolute. We remand for further proceedings consistent with this opinion.

## I. Procedural History

¶9 The People have charged the defendant, Nicholas Feyd Greer, with careless driving and leaving the scene of an accident. Greer applied for court-appointed counsel by completing and submitting Judicial Department Form ("JDF") 208. The introductory sentence encapsulates the form's purpose: "Because I . . . can't afford one, I would like the court to provide a state paid . . . [l]awyer." JDF 208. In attempting to establish his indigency, Greer reported that he is unemployed and has no income or assets. He acknowledged, however, that he and his daughter live rent-free in his parents' home and that his parents cover all of his household expenses. Greer further disclosed that his household has a monthly gross income of $7,200 and monthly expenses totaling approximately $6,000.

¶10 After reviewing Greer's application, the public defender concluded that he is indigent and thus qualifies for court-appointed counsel. The county court questioned that assessment, however. In response, the public defender argued that Greer's parents' income should not be considered because, although they have "chosen to share their home" with him and cover his household expenses,

they have "not chosen to share their income" with him.[2] And, continued the public defender, Greer has no access to his parents' other finances—he cannot withdraw funds from their bank accounts, use their credit cards, or assert any interest in their assets. The public defender then noted that Greer's parents are not willing to pay for an attorney to represent him in this case and that he has no basis to compel them to do so. Under these circumstances, urged the public defender, Greer's parents are akin to "roommates" whose income CJD 04-04 excludes from consideration because Greer has no right to it.

¶11 Attachment A to CJD 04-04, titled "Fiscal Standards—Eligibility Scoring Instrument," indicates in the "Income Guidelines" section that "gross income" refers to the gross income "from all members of the household who contribute monetarily to the common support of the household." CJD 04-04 Att. A. But that section also contains a roommates provision: "Income from roommates should not be considered if such income is not commingled in accounts or otherwise combined with the Applicant's income in a fashion which would allow the applicant proprietary rights to the roommate's income." *Id.* Stated differently, if income from a defendant's roommates is unavailable to the defendant, it should

_____

[2] It is undisputed that Greer's parents' income is unavailable to him.

not be reported.  Along the same lines, JDF 208 informs defendants that, while "income from household members who contribute to the common support of the home" should be included, "income from roommates" should only be considered if "you share bank accounts or commingle funds."

¶12    After listening to the public defender's contention grounded in the roommates provision, the prosecution agreed that Greer is indigent and therefore qualifies for court-appointed counsel.[3]    The county court nevertheless denied Greer's unopposed application.  In so doing, it considered Greer's parents' income and found that "*the family* does have income" to retain counsel.  (Emphasis added.) The court rejected the public defender's roommate analogy, explaining that roommates are "people [who] have chosen to be able to live together," and that this is not "a standard roommate experience."  Rather, reasoned the court, Greer's parents are simply members of his household who are paying for his household expenses.

¶13    Two days later, the public defender filed a motion to reconsider.  At the hearing held on that motion, the public defender stressed that, although Greer's parents are caring for him by providing food, shelter, and help with other basic

---

[3] The prosecution now sings a very different tune and opposes the relief requested by Greer.

needs, such assistance in no way confers funds to allow him to pay for an attorney to represent him in this matter. The county court was unmoved, however: "[I]t's much more broad than 'I just don't have access to my parents' money.' He's getting a lot of benefits [from his parents]." Regardless, insisted the public defender, Greer lacks the financial means to retain counsel. However, because Greer's parents' income is income from household members who contribute monetarily to the household, and because it found the roommates provision inapposite, the court stood by its ruling and denied Greer's request for court-appointed counsel.

¶14 Greer then filed a C.A.R. 21 petition seeking our intervention, and we issued a rule to show cause. Before forging ahead to analyze the merits of Greer's claim, we digress briefly to articulate why we decided to exercise our original jurisdiction.

## II. Original Jurisdiction

¶15 Under C.A.R. 21(a)(1), we have sole discretion to exercise our original jurisdiction. We have recognized, however, that Rule 21(a)(1) is narrow in scope. *People v. Sherwood*, 2021 CO 61, ¶ 13, 489 P.3d 1233, 1238. The relief provided by it is "extraordinary in nature." C.A.R. 21(a)(1). Thus, we have circumscribed exercise of our discretion under Rule 21(a)(1) to such scenarios as when "an appellate remedy would be inadequate, . . . a party may otherwise suffer

9

irreparable harm, or . . . a petition raises issues of significant public importance that we have not yet considered." *Sherwood*, ¶ 13, 489 P.3d at 1238 (quoting *People v. Lucy*, 2020 CO 68, ¶ 11, 467 P.3d 332, 335).

¶16 In his petition, Greer maintained that exercise of our original jurisdiction was justified because he had no other adequate remedy and the case presented an issue of first impression that was of great public importance. We agreed with him on both counts.

¶17 We have previously exercised our original jurisdiction where failing to do so would have forced a defendant to proceed without counsel of choice. *See People v. Nozolino*, 2013 CO 19, ¶ 8, 298 P.3d 915, 918. Had we declined to exercise our original jurisdiction here, it would have forced Greer to proceed not just without counsel of choice but without counsel altogether. Because Greer had no other adequate remedy, it was appropriate to exercise our original jurisdiction over this matter.

¶18 Moreover, whether a defendant qualifies as indigent and is entitled to court-appointed counsel is a question of great public importance with ramifications for many Coloradans. And this is untrodden territory—we have never interpreted CJD 04-04's instruction on income from household members who contribute monetarily to the household, much less applied it when such

10

income is unavailable to the defendant. For this reason, too, we chose to exercise our original jurisdiction.[4]

## III. Analysis

### A. Standard of Review

¶19 The starting post of our analysis is the controlling standard of review. Generally a court's indigency determination for purposes of state-funded counsel is reviewable for an abuse of discretion, though it is "subject to careful scrutiny for the reason that it involves a basic constitutional right." *Nikander v. Dist. Ct.*, 711 P.2d 1260, 1262 (Colo. 1986). However, whether Greer is indigent and therefore entitled to court-appointed counsel hinges on our interpretation of CJD 04-04, which makes this a question of law that we review de novo. *In re Betterton-Fike*, 2020 CO 19, ¶ 22, 459 P.3d 522, 526.

¶20 With this standard in mind, we segue into the authority that serves as our polestar in this case. We then examine the county court's denial of Greer's application for state-funded counsel.

---

[4] In granting Greer's Rule 21 petition, we necessarily decided that this was an issue worthy of our consideration as a court. Had we believed that amending CJD 04-04 was the wiser approach, we presumably would have denied Greer's petition.

11

## B. Relevant Authority

¶21 The Sixth Amendment to the U.S. Constitution guarantees the fundamental right to the assistance of counsel. *Argersinger v. Hamlin*, 407 U.S. 25, 30–31 (1972). The Colorado Constitution likewise guarantees a criminally accused's right to counsel. Colo. Const. art. II, § 16. "The right to counsel encompasses both the right to a retained attorney for a defendant who is financially able to pay for legal representation, and the right to a court-appointed counsel for an indigent defendant." *People v. Alengi*, 148 P.3d 154, 159 (Colo. 2006). Only the latter is implicated here.

¶22 The burden of establishing indigency is on defendants. *Nikander*, 711 P.2d at 1262. Notably, a defendant need not be destitute to qualify for court-appointed counsel. *Id.* It suffices if a defendant lacks "the necessary funds, on a practical basis, to retain competent counsel." *Id.* In determining indigency, the court must consider a defendant's "complete financial situation by balancing assets against liabilities and income against basic living expenses." *Id.* We have identified the following nonexhaustive factors as relevant to a determination of indigency: number of dependents, employment status, income from all sources, real and personal property owned, the extent of any indebtedness, necessary living expenses, and the income eligibility guidelines (which reflect the federal poverty guidelines). *Id.*

12

¶23    An indigency determination must be grounded in what is, not what could be, vis-à-vis a defendant's financial situation. *Id.* at 1262–63. In *Nikander*, we rejected the trial court's ruling that the petitioner was not indigent because he had failed to demonstrate that he was incapable of working more than twenty hours a week and generating additional income to pay for counsel. *Id.* We explained that the relevant inquiry in determining indigency "is whether the petitioner's *current financial status* affords him equal access to the legal process." *Id.* at 1263 (quoting *March v. Mun. Ct. for S.F. Jud. Dist.*, 498 P.2d 437, 442 (Cal. 1972)).

¶24    Our General Assembly has codified the right of "indigent persons who are charged with or held for the commission of a crime . . . to legal representation and supporting services at state expense." § 18-1-403, C.R.S. (2021). That statutory right exists only "to the extent and in the manner provided for in articles 1 and 2 of title 21, C.R.S." *Id.* Article 1 governs the "State Public Defender," while article 2 governs "Alternate Defense Counsel." We are concerned here only with article 1.

¶25    Upon submission of an application for court-appointed counsel, the public defender must assess whether the defendant is indigent. § 21-1-103(3), C.R.S. (2021). But that assessment is "subject to review by the court." *Id.* The court has the ultimate responsibility for making indigency determinations. *Id.*

¶26    Section 21-1-103 requires the public defender to represent indigent defendants when certain circumstances exist and certain conditions are met.

13

§ 21-1-103(1)–(2). The parties agree, and we thus assume, that Greer is entitled to court-appointed counsel in this case if he is indigent. The only dispute between the parties—and the only issue before us—is whether Greer is indigent. To address that question, we turn to CJD 04-04, the "fiscal standards or guidelines established by the supreme court" at the legislature's behest. § 21-1-103(1)(b), (2)(b); CJD 04-04. But first, an introductory word about CJDs.

¶27 CJDs are issued by the Chief Justice, "the executive head of the judicial system." *Off. of State Ct. Adm'r v. Background Info. Servs., Inc.*, 994 P.2d 420, 430 (Colo. 1999); Colo. Const. art. VI, § 5(2). They serve as the conduit through which the Chief Justice's administrative authority is implemented. *Off. of State Ct. Adm'r*, 994 P.2d at 430–431. We have consistently characterized CJDs as "policy statements" promulgated pursuant to "the supreme court's general superintending power over the court system." *Id.* at 431. The enforceability of CJDs is beyond question. *Id.* (observing that the Chief Justice "is entitled to exercise her authority through Chief Justice Directives").

¶28 CJD 04-04, "Appointment of State-Funded Counsel in Criminal Cases and for Contempt of Court," addresses, as pertinent here, indigency determinations "in criminal cases pursuant to Titles 16 and 18." More to the point, it establishes a policy "to assist the administration of justice with respect to the appointment of counsel." In sync with *Nikander*, an out-of-custody defendant like Greer is

14

indigent under CJD 04-04 if his financial circumstances prevent him from having "equal access to the legal process." *Nikander*, 711 P.2d at 1262–63; CJD 04-04 II-B. Because section 21-1-103(3) requires the public defender to make an initial indigency assessment, CJD 04-04 provides that "all persons seeking court-appointed representation in criminal matters shall complete form JDF 208 and shall first apply with the Office of the Public Defender." CJD 04-04 II-C.

¶29 There are multiple attachments to CJD 04-04. Attachment A, the eligibility scoring instrument, is the epicenter of our discussion. We thus concentrate on that attachment.[5]

¶30 Attachment A provides in relevant part:

> 1. Income Guidelines
> Gross income from all members of the household who contribute monetarily to the common support of the household.
>
> . . . .
>
> NOTE: Income from roommates should not be considered if such income is not commingled in accounts or otherwise combined with the Applicant's income in a fashion which would allow the applicant proprietary rights to the roommate's income.

CJD 04-04 Att. A. In lockstep with this provision, JDF 208 includes the following directions regarding "Income Before Taxes": "Don't include income from

---

[5] The instrument's factors mirror those outlined in *Nikander*. *Compare Nikander*, 711 P.2d at 1262, *with* CJD 04-04 Att. A.

roommates.  Only include their incomes if you share bank accounts or commingle funds."

## C.  Application

¶31    It is understandable that CJD 04-04 requires a defendant to include in the JDF 208 application any income from a member of the household who contributes financially to the household.[6]  For example, generally speaking, it makes no sense to exclude a defendant's spouse's income if the spouse contributes monetarily to the household.  Not surprisingly, the county court and the People argue that since Greer's parents are members of his household who contribute monetarily to the household, their income was properly considered as part of the indigency determination under challenge.  The premise of this argument is not incorrect — it is undisputed that Greer's parents are members of his household who pay for all of the household expenses — but it is incomplete.

---

[6] We view "household" in CJD 04-04 as referring to "those who dwell under the same roof and compose a family."  *Household*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/household [https:// perma.cc/ EUL4-P3VN]; *see also In re Marriage of Zander*, 2021 CO 12, ¶ 13, 480 P.3d 676, 680 (we construe an undefined statutory term in accordance with its ordinary and natural meaning).  The county court apparently had the same understanding — in its ruling, it specifically referred to Greer's "family" having sufficient income to secure legal representation for him in this case.

¶32    CJD 04-04 goes on to state that income from roommates should not be considered if the defendant has no "proprietary rights" to it. CJD 04-04 Att. A. In other words, to the extent that income from roommates (even those who contribute financially to the shared residence) is unavailable to the defendant, such income should not be reported in the application for court-appointed counsel. The county court concluded that the roommates provision in CJD 04-04 was inapplicable because Greer's parents are not "standard" roommates. Fair enough. Even so, we are not so dismissive of the roommates provision because it sheds light on our analysis.

¶33    The roommates provision clearly conveys that whether the defendant has access to roommates' income is relevant to the indigency inquiry—a court should consider roommates' income only if the defendant has access to it. True, the instruction in CJD 04-04 addressing income from members of the defendant's household who contribute financially to the household does not contain a similar restriction. But that instruction appears to assume that income from household members (i.e., family members) who contribute financially to the household is always available to the defendant. It would be illogical for CJD 04-04 to exclude income from a defendant's roommates (even those who contribute financially to the shared residence) when such income is unavailable to the defendant, while at the same time include income from a defendant's household members who

17

contribute financially to the household despite such income being equally unavailable to the defendant.

¶34 Significantly, the limitation in the roommates provision tracks our decision in *Nikander*. That case teaches that the indigency question turns on whether the defendant (not his family), on a practical basis, lacks the necessary funds to retain an attorney. *Nikander*, 711 P.2d at 1262. Hence, where, as here, members of the defendant's household contribute financially to the household but nevertheless deny the defendant access to their income, courts should take a more nuanced approach to determining indigency.

¶35 We now hold that, consistent with the roommates provision, income from members of a defendant's household who contribute monetarily to the household should be excluded from an indigency determination when such income is unavailable to the defendant. Any other interpretation would render CJD 04-04 internally inconsistent, not to mention at odds with our jurisprudence, and risk constitutional violations.

¶36 Considering Greer's complete financial situation, as we must, *see Nikander*, 711 P.2d at 1262, we cannot declare that he has the necessary funds to hire a lawyer. While Greer lives rent-free in his parents' home and is not responsible for any household expenses, he has no funds—none—to retain counsel. Balancing his assets (zero) against his liabilities (zero), as well as his income (zero) against his

living expenses (zero), means that he has zero dollars to pay for an attorney. His parents' income, which they have chosen to place out of his reach (as is their right), is of no assistance in his quest to secure legal representation. He cannot touch that money, much less spend it to retain counsel. Why, then, should that income be considered in determining whether he has the necessary funds to retain counsel?

¶37 Under the circumstances, denying Greer indigent status on the basis of his parents' income would be tantamount to denying him equal access to the legal process on the basis of his poverty. This we refuse to do.

¶38 The county court predicts that a parade of horribles will ensue from our decision. But we're not so easily scared off.

¶39 First, nothing we say today can be understood as making a defendant's personal income and bank account the only relevant factors in an indigency determination. Criminal defendants, public defenders, and courts must continue to follow CJD 04-04 in its entirety. The narrow question we address today is whether the county court properly considered Greer's parents' income, even though he has no access to it.

¶40 Second, the risk for gamesmanship and loopholes, while no doubt real, is a red herring—that risk already exists. Even before today's decision, a defendant with ample assets could have transferred all those assets to a spouse, domestic

partner, or parent living in the same household in order to allow the defendant to claim no ability to access the assets.

¶41 To be sure, indigency determinations are susceptible to gamesmanship and loopholes. It is precisely for that reason that the legislature deemed it fit to require: (1) a warning on any application for court-appointed counsel "that the application is signed under oath and under the penalty of perjury"; and (2) an advisement by the court to the same effect. § 21-1-103(3). We take solace in these statutory safeguards. Additionally, we trust that public defenders throughout the state will continue to be vigilant as they investigate applications for court-appointed counsel and make preliminary assessments of indigency. Finally, we are confident that our courts will keep doing their utmost to ensure that only those who lack the financial ability to hire a lawyer will receive court-appointed counsel. By way of example, in a future case, a trial court could make a factual finding that, notwithstanding a contention to the contrary, the defendant has access to income from household members. Or, alternatively, a trial court could find that the defendant's conduct suggests fraud or bad faith and warrants further investigation by the public defender.

¶42 Of course, we harbor no illusion that this belt-and-suspenders approach can ever ferret out all improper applications or otherwise render the system foolproof. There is no way to make the indigency-assessment paradigm perfect or otherwise

immune from corruption. Amending CJD 04-04 would be a toothless solution, not the panacea some might imagine. What makes the situation in this case difficult isn't the language of the CJD. If the CJD were amended to expressly state what we reasonably infer from it today, it would do nothing to dispel the concerns advanced by the county court and the People. The challenge lies in attempting to come up with a framework that affords all indigent defendants legal representation at state expense while preventing any defendant who is not indigent from gaming the system.

¶43    In the end, we realize that CJD 04-04 is unfortunately likely to remain vulnerable to abuse. It's possible, for instance, that a defendant's household members may intentionally withhold their income from the defendant to force the state to foot the bill for the defendant's legal representation. Fortunately, that's not a concern here because it is undisputed that Greer's parents' income is unavailable to him, and no one has suggested fraud or bad faith on Greer's part. Regardless, however, the interpretation of CJD 04-04 advanced by the county court and the People is unacceptable. Embracing that position would lead to the denial of court-appointed counsel for some defendants, like Greer, who truly have no funds (and no access to funds) to retain an attorney. The way we see it, if we have to choose between erring on the side of granting someone who is not indigent access to the legal process and erring on the side of denying someone who is

indigent such access, we prefer the former. *Cf. Johnson v. Louisiana*, 406 U.S. 380, 393 (1972) ("We therefore have always held that in criminal cases we would err on the side of letting the guilty go free rather than sending the innocent to jail.").

¶44 In short, we rule that income from a defendant's household members who contribute monetarily to the household should not be included in an indigency determination if such income isn't available to the defendant. While Greer's parents are members of his household and contribute monetarily to the household, their income is unavailable to him. Without access to his parents' income, Greer lacks the necessary funds, on a practical basis, to retain counsel. As such, his current financial status, considered in its totality, fails to afford him equal access to the legal process.

## IV. Conclusion

¶45 The determination of a defendant's indigency for purposes of state-funded counsel ultimately lays at the court's feet. We commend the county court in this case for taking this responsibility seriously. We nevertheless conclude that the county court erred in denying Greer's application for court-appointed counsel. Considering Greer's complete financial situation and analyzing it under our interpretation of CJD 04-04, he is indigent and eligible for court-appointed counsel. We therefore make the rule absolute and remand the case to the county court for further proceedings consistent with this opinion.

**JUSTICE HOOD,** joined by **JUSTICE MÁRQUEZ,** dissented.

JUSTICE HOOD, joined by JUSTICE MÁRQUEZ, dissenting.

¶46   The majority makes fair points, and it's difficult to resist their invitation to expand representation of the indigent. I don't question the goal. I just worry about the path. Rather than circumventing the plain language of a longstanding chief justice directive ("CJD"), why not just amend it (preferably after considering alternatives from other states and agencies and after receiving input from the leadership of affected organizations)? Because I see no need to rush to judgment in this misdemeanor traffic case, in which the county court simply applied the letter of the existing directive, and because I fear that we risk confusing judicial officers around the state, I must respectfully dissent.[1]

¶47   We can parse the plain language of the relevant portion of CJD 04-04, Appointment of State-Funded Counsel in Criminal Cases and for Contempt of

---

[1] I do not mean to diminish the significance of the matter for Greer. But the magnitude of the charges against a defendant is a key consideration in defining the scope of the constitutional right to counsel. Indeed, were the district attorney to stipulate to no jail in this case, the whole inquiry about court-appointed counsel would become moot. *See Argersinger v. Hamlin*, 407 U.S. 25, 37–38 (1972) (setting forth an actual imprisonment standard for the right to counsel under the Sixth Amendment); *People v. Lucero*, 584 P.2d 1208, 1214 (Colo. 1978) ("The United States Supreme Court has expressly guaranteed to a defendant the Sixth Amendment right to retained or appointed counsel, whenever imprisonment is imposed.") (citing *Argersinger*, 407 U.S. at 37–38). Therefore, it also seems reasonable to allow the magnitude of the charges to inform what serves as a good vehicle for this court to consider this question.

1

Court (amended July 2018), in a paragraph. The majority rightly describes Attachment A to CJD 04-04, the eligibility scoring instrument, as "the epicenter of our discussion." Maj. op. ¶ 29. Attachment A specifies that "[g]ross income from all members of the *household* who contribute monetarily to the common support of the *household*" must be considered in determining indigency. (Emphases added.) However, CJD 04-04 doesn't define the term "household." Because construing CJDs is an activity in which we rarely engage, we don't have canons of directive construction. But we typically construe an undefined statutory term in accordance with its ordinary and natural meaning. *In re Marriage of Zander*, 2021 CO 12, ¶ 13, 480 P.3d 676, 680. The majority agrees that the common meaning of "household" is "those who dwell under the same roof and compose a family." *Household*, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/household [https://perma.cc/EUL4-P3VN]; Maj. op. ¶ 31 n.6. Therefore, as the majority somewhat reluctantly acknowledges, members of a household are not roommates. Maj. op. ¶ 32. Moreover, because CJD 04-04 uses the separate terms "household member" and "roommate," we presume that the two words were intended to have independent significance. *See St. Vrain Valley Sch. Dist. RE-1J v. A.R.L.*, 2014 CO 33, ¶ 23, 325 P.3d 1014, 1022 (noting that by giving different words independent effect, no word is rendered superfluous).

¶48    Here, it is undisputed that Greer lives with his parents and that they pay his household expenses. Therefore, Greer's parents are household members who contribute monetarily to the common support of the household, and, under the current directive, their income must be counted in determining Greer's entitlement to court-appointed counsel.

¶49    Furthermore, I agree with the county court that to hold otherwise creates the potential for confusion and mischief. First, today's ruling undermines CJD 04-04's direction to assess gross household income because the controlling inquiry simply becomes a defendant's personal income and bank accounts. Second, it heightens the potential for gamesmanship. After today's ruling, a criminal defendant with ample assets could transfer them to a spouse, domestic partner, or parent living in the same household, and then have that person pay their expenses while claiming no ability to access the assets.

¶50    That is not to say that we should avoid the problem altogether.

¶51    While the majority alludes to the constitutional implications of today's decision, Maj. op. ¶ 6, I am unaware of any constitutional definition of indigency, and the majority points to none. On the contrary, "Supreme Court opinions speak generally of the rights of an 'indigent defendant' without offering any specific definition of 'indigency.'" 3 Wayne R. LaFave et al., Criminal Procedure § 11.2(g) (4th ed. 2021).

3

¶52    Instead, states have been left to devise their own standards for indigency. And those standards vary dramatically, particularly when it comes to defining household income:

> Jurisdictions are divided on the consideration of the earnings and property of family members of the accused. Many jurisdictions, in calculating the resources available to defendant, will not consider the income and resources of a family member unless that person has a legal obligation to support the defendant (as in the case of the parents of unemancipated minor). Other jurisdictions, however, will take into account the assets and income of a spouse even though one spouse has no legal obligation to finance the other spouse's legal defense. That position commonly recognizes two exceptions—where the spouses do not share the same household, and where the spouse is the victim of the charged offense. Some states will consider the assets and income of all family members who are part of the same household, and the support of absent family members where it has been provided in the past and there is no indication it will discontinue.

*Id.* (citations omitted).

¶53    I submit that this court, or the Chief Justice exercising his constitutional prerogative in consultation with the State Court Administrator's Office, the Office of the Public Defender,[2] and the Office of Alternate Defense Counsel, would do well to more carefully consider how other states approach this delicate issue.

---

[2] The deputy public defender assigned to the case concluded that Greer should be deemed indigent, but my concern is for the systemic implications of today's ruling. Therefore, I believe it would have been more prudent for this court or the Chief

4

¶54 As it stands, Colorado, like most states, uses the federal poverty guidelines to determine eligibility for court-appointed counsel. John P. Gross, *Too Poor to Hire a Lawyer but not Indigent: How States Use the Federal Poverty Guidelines to Deprive Defendants of their Sixth Amendment Right to Counsel*, 70 Wash. & Lee L. Rev. 1173, 1194–95 (2013). Therefore, we would also do well to consider various definitions from the public benefits context (mindful of the absence of constitutional significance but looking for more nuanced guidance all the same).

¶55 And those definitions apparently also vary significantly. For example, just this month, the United States Department of Health and Human Services updated its poverty guidelines. It finished its proclamation with this caveat:

> This notice does not provide definitions of such terms as "income" or "family" as there is considerable variation of these terms among programs that use the poverty guidelines. The legislation or regulations governing each program define these terms and determine how the program applies the poverty guidelines. In cases where legislation or regulations do not establish these definitions, the entity that administers or funds the program is responsible to define such terms as "income" and "family." Therefore, questions such as net or gross income, counted or excluded income, or household size should be directed to the entity that administers or funds the program.

---

Justice to seek input from statewide leadership about staffing considerations and other fiscal impacts.

Annual Update of the HHS Poverty Guidelines, 87 Fed. Reg. 3315, 3316 (Jan. 21, 2022), https://www.govinfo.gov/content/pkg/FR-2022-01-21/pdf/2022-01166.pdf [https://perma.cc/AZ35-V5SD].

¶56 The Legal Services Corporation ("LSC"), which provides substantial funding to Colorado Legal Services, also uses the federal poverty guidelines to calculate eligibility. Legal Services Corporation Financial Eligibility, 45 C.F.R. § 1611.3 (2021). And federal regulations in that context dictate that "'[i]ncome' means actual current annual total cash receipts before taxes of *all persons who are resident members and contribute to the support of an applicant's household*, as that term is defined by the [organizational] recipient." *Id.* § 1611.2(i) (emphasis added).

¶57 If the term "income" in the public benefits context ordinarily reaches as broadly as the LSC definition, perhaps we would do better to abandon the use of the federal poverty guidelines altogether and move to a more ad hoc means-testing scheme. While the majority resists the notion that its decision pulls us in that direction, Maj. op. ¶ 39 ("[N]othing we say today can be understood as making a defendant's personal income and bank account the only relevant inquiry in an indigency determination."), I'm not sure that its new rule provides trial courts with a meaningful distinction. After all, the majority today instructs them to count all household income. Maj. op. ¶¶ 31, 39. But in the same breath, it tells them not to count any household income to which the defendant has no access, Maj. op.

6

¶ 35, ignoring all the while that he indirectly has access to the portion of this income necessary to cover all his living expenses. Therefore, the analysis collapses into what means the defendant has as an individual.

¶58    While I applaud the majority's effort to increase representation for indigent criminal defendants, I worry about the unanticipated consequences of today's ruling. Because I favor a more circumspect approach to this pervasive and complex problem, I respectfully dissent.